UNITED STATES of America, Appellee,

v.

Frederick A. GROSS, Appellant.

UNITED STATES of America, Appellee,

v.

William Michael SEARCY, Appellant.

Nos. 91–1520, 91–1568.

United States Court of Appeals,
Third Circuit.

Argued Feb. 3, 1992.

Decided April 20, 1992.

Rehearing Denied May 19, 1992.

Donald J. Goldberg (argued), Philadelphia, Pa., for Frederick A. Gross.

Carmen C. Nasuti (argued), Nasuti & Miller, Philadelphia, Pa., for William Michael Searcy.

Michael M. Baylson, U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Joseph T. Labrum, III (argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before: BECKER and ROTH, Circuit Judges, and McCUNE, District Judge.*

BECKER, Circuit Judge.

Defendants Frederick Gross and William Michael Searcy appeal from judgments against them in a criminal case arising from their participation in a scheme to deceive and defraud shareholders of a company in which they were officers. Gross was convicted of one count of conspiring to violate the securities laws, 18 U.S.C. § 371 (1988), and two counts of making false statements to the Securities and Exchange Commission ("SEC"), 15 U.S.C. §§ 78m(a), 78ff(a) (1988). Although Searcy was acquitted of both conspiracy to violate the securities laws and causing the filing of a false statement with the SEC, he was convicted of two counts of insider trading, see 15 U.S.C. §§ 78j(b) and 78ff (1988) and two counts of mail fraud, see 18 U.S.C. §§ 1341 and 1342 (1988).

On appeal, Gross argues that the district court erred in not instructing the jury that "good faith" was a defense to the crimes with which he was charged. He also claims that the government violated the Jencks Act, 18 U.S.C. § 3500 (1988). Finally, he argues that the district court, in sentencing him, contravened FRCrP 32(c)(3)(D). Searcy also presses the Jencks Act claim. In addition, he contends that his convictions should be reversed because his acquittal on the false statements count was inconsistent with a finding of guilt on the remaining charges and because the district court made certain erroneous rulings at trial. For the reasons that follow, we will affirm.

## I. FACTS AND PROCEDURAL HISTORY

Gross was co-founder and Chief Executive Officer of Systems and Computer Technology Corporation ("SCT"), a computer company headquartered in Malvern, Pennsylvania. Searcy was the company's Vice President and one of its Directors.

SCT provided computer services to a number of leading American colleges and universities. According to the indictment, Gross and Searcy entered into a conspiracy (Count One) to artificially inflate the income recognition of SCT in order to make the company's publicly-traded stock more attractive to potential and current shareholders. The conspiracy allegedly arose in 1984 when Gross became concerned about the adverse appearance of the company's financial health and resolved to alter it.

According to the government's evidence, early in 1984, Gross directed employees of SCT to issue so-called "out letters" to individuals who had signed or might sign contracts for the provision of goods and services by SCT. The "out letters" gave the clients the option to escape from what would otherwise be legally binding contracts. Nonetheless, the company's revenue reports, prepared by individuals relying on the contracts alone without knowledge of the "out letters," treated the contracts as if they were binding, thereby falsely inflating the revenues reported in the company's revenue reports.

The government further established that because of Gross's deception, false statements about the company's revenue were included in filings with the SEC for the second (Count Two) and third quarters (Count Three) of 1984. The government contended that Searcy also caused the latter filing. In addition, the government's evidence showed that Searcy traded in SCT stock while aware that the stock's value was inflated by the false statements made in the SEC filings. On August 1 and 2, 1984, after the filing of the Third Quarter Report, Searcy sold SCT stock (Counts Four and Five). On August 3 and 4, 1984, Searcy was mailed brokerage confirmations regarding the sale of his stock (Counts Six and Seven). The scheme was exposed when the auditors for SCT uncovered one of the "out letters," and further investigation unveiled the rest of the deception. The indictments followed.

---

* Honorable Barron P. McCune, United States District Judge for the Western District of Pennsylvania, sitting by designation.

Gross acknowledged at trial that he had taken many of the actions that the government alleged; nevertheless, he contended that he had acted without knowledge of the wrongfulness of his actions and that he could not be convicted of the charged crimes because they required knowledge and willfulness, which he did not possess. Consistent with this theory, Gross requested a jury charge which stated that his good faith was a defense to all the crimes with which he was charged. Gross's proposed jury charge read:

Since an essential element of the crime charged is intent to defraud, it follows that good faith on the part of a defendant is a complete defense to a charge of securities fraud.

A defendant, however, has no burden to establish a defense of good faith. The burden is on the government to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt. Even false representations or statements or omissions of material facts do not amount to a fraud unless done with fraudulent intent. However misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of the representations made by a defendant is a good defense, however inaccurate the statements may turn out to be.

The district court gave this instruction with respect to Searcy on Counts Four through Seven. The court refused, however, to give it with respect to Gross on any of the counts on which he was charged.

Searcy also attempted to demonstrate that he was acting in good faith. He defended himself in part by producing evidence of his good character and arguing that it was inconsistent with the kind of deceptive practice alleged in the indictment. However, Searcy was not allowed to elicit one allegedly important response in this vein, from Peter Walsh, outside counsel for SCT and a government witness at trial. On redirect examination, the government asked Walsh why Searcy had been chosen to replace another SCT official to deal with questions from the public during the investigation of the SCT scandal. The prosecution withdrew the question, but during a subsequent colloquy, outside the hearing of the jury, Walsh stated that Searcy had been chosen for that job because he was "intelligent, articulate and a man of integrity." Searcy's counsel sought to have that testimony repeated in front of the jury, but the district court denied the request on the ground that Walsh had already "testified as to his estimate of [Searcy's] character" and because the court believed Walsh was not competent to testify about the motives of people inside SCT.

Searcy also objected to what he claimed was the government's attack in its closing on his character and on that of his counsel. The prosecution made its most damning comment when, in concluding, the prosecutor asked the jury to "end the defense charade, all the posturing, all the lies, and put the blame where it belongs." Defense counsel immediately moved for a mistrial on the ground that the prosecution's statement impugned the integrity of both defense counsel at trial. The district court denied the motion, but instructed the jury to disregard the prosecutor's statement.

As noted above, the jury convicted Gross on the conspiracy count and on both counts of filing of false statements. Searcy was acquitted on the conspiracy charge and on the filing of false statements charge. The jury convicted him, however, on both insider trading counts and on both mail fraud counts.

After trial but before sentencing, it became apparent that the government had not provided defense counsel with all the notes that it had taken of pre-trial investigative interviews of Henry Simmons, SCT's Chief Financial Official and a key government witness at trial. Counsel for Gross and Searcy became aware that not all the notes had been provided when they examined the government's sentencing memorandum regarding Simmons. That memorandum indicated that there had been thirteen government interviews with Simmons, but counsel for Gross and Searcy had been provided with notes for only six interviews,

despite their requests for all Jencks material, including prosecutor's notes of interviews. The Jencks Act requires that district courts "order the United States to produce any statement ... of the witness in the possession of the United States which relates to the subject matter to which the witness has testified." See 18 U.S.C. § 3500(b) (1988).

Upon making this discovery, defense counsel requested that the government provide the notes to them. The government declined initially because it stated that the notes were not notes related to a particular government interview. At a hearing on January 2, 1991, however, the Assistant United States Attorney changed his position and represented that the notes had been destroyed. Then, in February, 1991, the notes reappeared, and the government delivered them to the court for an *in camera* review in order to determine whether they were Jencks material. After its *in camera* review, the district court held that the notes were not Jencks material, and it denied the defendants' request for an adversarial hearing to determine whether these or any other notes had been altered or destroyed.

The presentence investigation report for Gross contained a section entitled "Victim Impact Statement," which purported to detail the various harms that the defendant's crimes had caused. Among other things, the report represented that Gross's crimes had caused SCT's shareholders' stock to decline in value by $140,000,000. Pursuant to F.R.Cr.P. 32(c)(3)(D), Gross's counsel objected to the inclusion of that figure in the report. The government offered to provide testimony to support the figure, but the district court declined the offer, because, it represented, the determination of sentence would not be influenced by the $140,000,000 figure. The court entered an order stating, "The Court will not rely upon the $140 million shareholder loss figure cited in the Presentence Report as a basis for sentencing." When the district court sentenced Searcy, however, it stated with regard to Gross, "My decision [not to consider the $140,000,000 figure] did not mean that the enormity of the loss occasioned by

the defendant's conduct is not a factor in sentencing." Indeed, in sentencing Gross, the court commented:

> The dimensions of the fraud here were enormous, and the harm that was inflicted on so many people was enormous, and out of that rises a public interest to be vindicated ...

Because the offense conduct in the case occurred before November 1, 1987, the effective date of the Sentencing Guidelines, the guidelines did not control the district court's sentencing decision. See 18 U.S.C. § 3551 (West Supp. 1989). On Count One, the court sentenced Gross to two years' imprisonment and a fine of $100,000. On Counts Two and Three, the court suspended imposition of sentence and placed Gross on two years' probation. The court placed Searcy on probation for two and one-half years and ordered him to do two hundred hours of community service. After entry of the judgments, both Gross and Searcy filed timely appeals. We have appellate jurisdiction under 28 U.S.C. § 1291 (1988).

## II. FAILURE TO GIVE THE GOOD FAITH INSTRUCTION (GROSS)

■ We review Gross's claim that the district court erred in refusing to give an instruction on good faith under an abuse of discretion standard. See *United States v. Leo*, 941 F.2d 181, 200 (3d Cir.1991). We evaluate whether the proffered instruction was legally correct, whether it was not substantially covered by other instructions, and whether its omission prejudiced the defendant. *United States v. Smith*, 789 F.2d 196, 204 (3d Cir.1986).

Gross represents that his only real defense to the government's charges was good faith and that he stressed good faith throughout the presentation of his case and in his closing. He argues that the failure to provide such an instruction therefore deprived him of the defense and constitutes an abuse of discretion. He further claims that the failure to instruct on good faith was uniquely prejudicial in this case because the district court gave the instruction with respect to Searcy on Counts Four

through Seven. Gross argues that the good faith instruction given for Searcy suggested, by negative implication, that the defense was not available to Gross. We must first consider whether the failure to give such an instruction, standing on its own, is an abuse of discretion. Then, we must consider whether giving such an instruction with respect to Searcy gave rise to any unique form of prejudice that requires reversal.

### A. *Failure to Give a Good Faith Instruction Generally*

 Count One, which charged Gross with conspiracy, required the government to show that he "agreed to participate in an unlawful scheme with knowledge of its essential nature." See *United States v. Gomberg*, 715 F.2d 843, 847 (3d Cir.1983) (citations omitted). Similarly, conviction on the false statements charges required the government to show that Gross acted with knowledge of the wrongfulness of his actions. See *United States v. Dixon*, 536 F.2d 1388, 1397 (2d Cir.1976). The government thus concedes that if Gross believed that what he was doing was lawful, he could not have been convicted of the crimes with which he was charged. The question for our consideration is whether the failure to instruct specifically on good faith as a defense was an abuse of discretion because, in its absence, the jury may not have recognized that proof of the defendant's bad faith was an element of the crimes with which Gross was charged and had to be proven beyond a reasonable doubt.

The district court's reasons for declining to give Gross's requested instruction on good faith are not clear. At one point, the court appears to have believed that such an instruction was unnecessary. Later, however, in its opinion on post-trial motions, the district court held that it had not committed error in refusing to instruct on good faith because:

> ... instructions to the jury on the conspiracy count adequately covered both the two objects of the conspiracy and readily cautioned the jury that the government must prove that defendant's joinder in the conspiracy was undertaken knowingly and willfully and with the specific intent to encourage, advise or assist in the furtherance of the unlawful understanding or scheme.

The instructions that the court gave regarding Count One were as follows:

> Before you may find that a defendant has become a member of a conspiracy, the evidence in the case must show beyond a reasonable doubt that the conspiracy was knowingly formed and that the defendant willfully participated in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy.

> To act or participate willfully means to act or participate voluntarily and intentionally and with specific intent to do something the law forbids or with specific intent to fail to do something the law requires to be done. That is to say, to act or to participate with a bad purpose either to disobey or disregard the law.

With respect to Counts Two and Three, the district court also instructed on the elements of the crime:

> [You] must find that the defendant knew the statement made or caused to be made was false. An act is done knowingly if done voluntarily and intentionally. The defendant must have been aware of what he was doing and what he was not doing.

> ... [Y]ou must find that if the defendant made or caused to be made a false statement he was acting willfully, that is deliberately or on purpose and not because of mistake, inadvertence or accident.

We must decide whether these instructions, standing on their own, are adequate and serve as a surrogate for the good faith defense instruction, as the government contends, or whether Gross was entitled to a separate instruction stating that if he acted in good faith he could not be convicted.

Although several other circuits have confronted this issue, it is a question of first impression for us. The majority of circuits have held that an instruction setting forth all of the elements of a "knowledge" crime is sufficient and, hence, that a district court does not abuse its discretion in refusing to

instruct on the good faith defense. See *United States v. McElroy*, 910 F.2d 1016, 1025–26 (2d Cir.1990); *United States v. Rochester*, 898 F.2d 971, 978–79 (5th Cir. 1990); *United States v. Nivica*, 887 F.2d 1110, 1125 (1st Cir.1989); *United States v. Green*, 745 F.2d 1205, 1209 (9th Cir.1984); *United States v. McGuire*, 744 F.2d 1197, 1201–02 (6th Cir.1984); *United States v. Gambler*, 662 F.2d 834, 837 (D.C.Cir.1981). Two circuits, however, have held that a district court abuses its discretion by refusing to give a good faith defense charge even if the court has already given an instruction on the elements of the crime. See *United States v. Casperson*, 773 F.2d 216, 223–24 (8th Cir.1985); *United States v. Hopkins*, 744 F.2d 716, 718 (10th Cir. 1984) (en banc).

The majority position derives from the theory that the good faith defense instruction is merely surplusage. Rather than treating good faith as an affirmative defense, these circuits have viewed the good faith instruction as simply a reiteration that the government must carry its burden in demonstrating that the accused acted knowingly and willfully, because a jury finding that the defendant has acted knowingly and willfully is inconsistent with a finding that the defendant acted in good faith. Thus, according to the majority position, if an instruction already contains a specific statement of the government's burden to prove these elements of the crime, the good faith instruction is simply a redundant version of the instruction on those elements. In contrast, those circuits that have held to the contrary have emphasized that a specific instruction on good faith "directs the jury's attention to the defense of good faith with sufficient specificity to avoid error." *Casperson*, 773 F.2d at 223. Under this view, conveying to the jury the essence and context of the good faith defense is of crucial importance.

We are persuaded by the majority view, and agree that a jury finding of good faith is inconsistent with a finding that the defendant acted knowingly and willfully. Therefore, in this case, we conclude that failure to give the instruction on the good faith defense did not constitute an abuse of discretion. By giving a detailed instruction on the elements of the crime with which Gross was charged, the court ensured that a jury finding of good faith would lead to an acquittal. Consistent with our well-established practice of evaluating the jury charge as a whole, we find that the district court's charge was within the bounds of its discretion. See *Ayoub v. Spencer*, 550 F.2d 164, 168 (3d Cir.1977).

While it was not reversible error for the district court to refuse to give the good faith instruction in this case, we commend to the district judges in the exercise of their discretion its use as a supplement to the "knowing and willful" charge in future cases.

B. *Failure to Instruct on Good Faith With Respect to Gross But Not Searcy*

Gross contends that even if it is not error to refuse to give a good faith instruction in a normal case, it was error to refuse to give such an instruction in this case with respect to Gross and not Searcy. When charging the jury on Counts Four through Seven, with which only Searcy was charged, the district court gave the good faith instruction that Gross had requested on Counts One through Three. Gross argues that giving such an instruction strongly suggested that the good faith defense was available to Searcy, but not available to Gross, and that the suggestion was heightened by the fact that the district court, at numerous points during its instruction, specifically cautioned that those instructions given with respect to Gross only applied to Gross and those instructions given with respect to Searcy only applied to Searcy.

The government responds by pointing out that Searcy, who was also charged with Counts One through Three, was deprived of a charge on good faith with respect to those counts. The charge on good faith for Searcy came only with respect to Counts Four and Five, with neither of which Gross was charged. The government thus contends that no negative implication could have arisen when neither defendant re-

ceived the good faith instruction on the crimes with which both defendants were charged.

While Gross has made a strong argument about the dynamics of jury perception and deliberation, the government's argument also has much force and persuades us that the jury was not misled. Moreover, as we have explained above, we do not believe that the jury, following the instructions given by the court, would have convicted Gross had it believed he acted in good faith. Therefore, we do not believe that the district court abused its discretion or acted in a manner that resulted in prejudice to Gross, and we find no reversible error in the district court's failure to give a good faith instruction in this case.

### III. FAILURE TO DISCLOSE JENCKS MATERIAL (GROSS AND SEARCY)

#### A. *Introduction*

Well after the trial was over, the government provided the district court with several pages of notes concerning interviews with its witness Simmons that the government had not previously supplied to the court or to the defendants. Gross and Searcy urge that the government's failure to provide notes concerning seven interviews with government witness Simmons prior to trial violated the Jencks Act, see 18 U.S.C. § 3500 (1988), and deprived defendants of their right to put on a defense.

Defendants sought a hearing to explore whether the notes of interviews with Simmons were in fact Jencks material and whether or not the government (or anyone else) had destroyed Jencks material. Defendants requested that the hearing be adversarial because, they argued, the circumstances surrounding the temporary disappearance of the notes were highly suspicious. Defendants contended before the district court and urge on appeal that the notes presented to the district court may have been altered by the government or by others during the time when the government was unaware of the notes' location. Further, defendants argue that since the notes were temporarily mislaid, portions of the notes may have been destroyed or lost.

The district court, exercising its discretion, rejected the defendants' request for an adversary hearing and held a hearing *in camera,* at which the court determined that the materials need not be disclosed to defendants under the Jencks Act. Defendants now urge that that decision was reversible error.

Our consideration of this issue involves two levels of analysis. First, we must consider whether the material sought by the defendants is the kind of material that the government is required to disclose to defendants under the Jencks Act. Second, we must consider whether the circumstances surrounding the notes' disappearance is sufficiently suspect to merit a hearing to determine whether any potential Jencks material was altered or destroyed.

#### B. *Was the Material Sought Jencks Act Material?*

■ We review the district court's finding that the evidence was not Jencks material and the district court's decision to hold an *in camera* hearing under an abuse of discretion standard. See *Palermo v. United States,* 360 U.S. 343, 79 S.Ct. 1217, 1226, 3 L.Ed.2d 1287 (1959).

■ The Jencks Act requires that three kinds of witness statements within the possession of the government must be made available to the defendant:

(1) a written statement made by said witness and signed or otherwise adopted by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

As the Supreme Court recognized shortly after the enactment of the Jencks Act, the Act itself provides no procedure for determining whether material sought by the de-

fendants falls within any of these categories. See *id.* 79 S.Ct. at 1225. The Court therefore suggested an *in camera* review procedure which would serve the purposes of the Act, which it construed as "limiting and regulating defense access to government papers." *Id.* Pursuant to the Court's command in *Palermo*, district courts have enforced the Act by having the government submit statements requested by defendants to the court for *in camera* review outside the presence of counsel.

■ Experience has shown that in the vast majority of cases, submission of the material for *in camera* review is adequate to determine whether the materials are the kinds of statements that must be revealed to the defense under the Jencks Act. See *Twentieth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals,* 79 Georgetown L J 591, 814–15 (1991) (discussing cases). The district court also decides "what, if any, evidence extrinsic to the statement itself may or must be offered to prove the nature of the statement." *Palermo,* 79 S.Ct. at 1226. If the court believes that such extrinsic evidence is necessary to determine whether the statement is in fact Jencks material, it may hold a hearing to elicit such evidence. In this case, the court chose only to look at the statements themselves to determine whether they were Jencks material.

We have also reviewed the requested notes *in camera.* We first consider whether the statements, in the condition in which we have viewed them, constitute Jencks material. Clearly, the prosecutor's notes from his interviews with Simmons were not a record of Simmons's testimony before the grand jury, and, hence, they need not be revealed under § 3500(e)(3). We therefore need only decide whether they are statements made and adopted by the witness or a substantially verbatim recital of oral statements made by the witness.

We conclude, based on our review both of those materials and of the record, that the district court did not abuse its discretion in finding that the notes from the Simmons interviews were not statements

made or adopted by Simmons. Nothing about the notes indicates that Simmons adopted them as his own statement. Further, the record demonstrates that both the prosecutor handling the interview and the witness, Simmons, made affidavits stating that Simmons did not adopt any of the prosecutor's notes as statements of his own. Based on this evidence, we hold that the district court did not abuse its discretion in finding that the materials did not constitute materials covered by 18 U.S.C. § 3500(e)(1).

■ Nor did the district court err in determining that the Simmons notes were not a "substantially verbatim" recital of statements made by Simmons to prosecutors. See 18 U.S.C. § 3500(e)(2). For the most part, the notes reflect the prosecutor's reactions to the witness rather than a direct quotation of what the witness said. A review of the Simmons notes demonstrates that they do not resemble a verbatim transcript but rather are a short summary of information that Simmons was providing. Although, as the district court observed, the notes may occasionally reflect precise phrases used by the witness, the presence of such brief quotations is inadequate to qualify the notes as Jencks material. See *United States v. Cuesta,* 597 F.2d 903, 914 (5th Cir.1979) (notes were not Jencks material even though they contained some verbatim recitations of phrases used by the interviewee). Therefore, we will affirm the district court's holding that the Simmons notes turned over to the court after conviction are not Jencks material.

C. *Did the Government's Conduct in this Case Require an Adversary Hearing?*

■ Defendants argue that, even if the Simmons notes now in our possession appear not to be material that requires disclosure, we should, nonetheless, remand for an adversarial hearing so that the district court can determine whether any additional evidence was destroyed or whether the evidence presently in our possession was tampered with. Their overarching contention is that the government's pecu-

liar behavior regarding the Simmons notes suggests the government may have altered or completely rewritten them. The government did initially report that it had interviewed Simmons fewer times than it actually had; then the government represented that the notes from the initial interviews had been destroyed; finally, the government indicated that it had found the notes, and it turned them over to the court. Alternatively, defendants argue that this chain of events at least suggests that the government was not aware where the notes were for a substantial period of time, during which time the notes may have been tampered with or some portion of them lost. Again, we review the district court's decision to deal with this matter via an *in camera* hearing under an abuse of discretion standard. See *Palermo v. United States,* 360 U.S. 343, 79 S.Ct. 1217, 1225–26, 3 L.Ed.2d 1287 (1959).

In formulating their request for a hearing on the Simmons notes, defendants rely on *Campbell v. United States,* 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961). In *Campbell,* a witness testified that a government agent had recorded in writing a statement that the witness adopted as his own. The prosecutor, when asked about the statement, represented that he was unaware of it. The district court held a hearing, but declined to require the government to produce the testimony of a special agent who had prepared an interview report of the witness during the investigation. The Supreme Court held that the failure to require the special agent's testimony at an adversarial hearing was error and that, to ensure fairness to the defendant, the district court was required to produce the testimony of the special agent.

The circumstances of this case are much different from those in *Campbell.* There, the witness stated that he had adopted a statement that was in the government's possession but that had not been produced to the defendant after a Jencks Act request. In this case, the witness (Simmons) has sworn that he never adopted any of the government's written statements as his own. Further, review of the interview notes themselves reveals that they do not

fall within any of the categories of statements that the Jencks Act requires must be revealed to defendants.

Defendants' suggestion that the notes may have been tampered with is merely conclusory and speculative. At all events, the contention was properly evaluated in the *in camera* proceeding before the district court by careful examination of the notes, and our review suggests the same result. Defendants have offered no plausible theory of destruction or alteration of evidence that would merit holding that the district court abused its discretion in this case. Therefore, we will affirm the district court's holding that the Jencks Act did not require disclosure of the Simmons notes and that a hearing was not required.

## IV. THE ALLEGED INCONSISTENCY OF VERDICTS (SEARCY)

■ Searcy was acquitted on Count Three, which charged him with knowingly causing the filing of a false statement with the SEC, but convicted on Counts Four and Five, which charged insider trading, and on Counts Six and Seven, which charged mail fraud. Searcy notes that all five of these crimes involved the same level of intent, i.e., the defendant had to perform the acts knowingly and willfully. He argues that his acquittal on Count Three demonstrates he did not have the requisite knowledge and willfulness required to convict on the remaining counts, that the verdicts are inconsistent, and that his conviction on Counts Four through Seven must therefore be set aside.

We find this argument without merit for two reasons. First, contrary to Searcy's suggestion, the jury may have acquitted Searcy because it believed that the government had failed to demonstrate one of the elements required to prove the filing of a false statement other than knowledge and willfulness. For example, as the district court noted, the government may have failed to make the required showing that Searcy "caused" the false statements to be filed. Searcy urges that the jury could not have failed to find that he caused the false

filing because Searcy approved the filing at a meeting of SCT's Board of Directors on August 2, 1984, the day immediately preceding those on which he engaged in mail fraud and insider trading. We agree with the district court, however, that the jury may not have interpreted Searcy's presence at the Board of Directors meeting and his approval of the report as sufficient to demonstrate that he "caused" the statements to be filed. We note in this regard that Searcy had a lesser role in the corporate hierarchy than Gross did. For these reasons, we reject Searcy's contention that the verdicts are inconsistent.

■ Even were we to agree with Searcy, however, that an inconsistency exists, this conclusion would not merit reversal of his convictions. In *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 477–78, 83 L.Ed.2d 461 (1984), the Supreme Court rejected a defendant's argument that her acquittal on one count, which was inconsistent with another count on which she was convicted, entitled her to a reversal of her conviction. The Court noted that inconsistent verdicts are often "a product of jury lenity." *Id.* 105 S.Ct. at 477. Consequently, the Court held that the inconsistency between the acquittal and the conviction did not require a reversal of the conviction.

The Court did note an exception in *Powell* for those situations where "a defendant is convicted of two crimes, where a guilty verdict on one logically excludes the other." *Id.* at 479 n. 9. Searcy argues that the logical underpinning of this exception is that inconsistent findings by a jury cannot be allowed to stand. We disagree. The exception only operates in those situations where a jury has convicted a defendant of two crimes and those *convictions* are mutually exclusive. Such a result would be patently unjust because a defendant would be convicted of two crimes, at least one of which he could not have committed. Here, Searcy is arguing that an *acquittal* is inconsistent with four convictions. As *Powell* makes clear, inconsistency between acquittals and convictions may result from jury lenity and does not merit reversal of the convictions. Therefore, we hold that

Searcy's argument is foreclosed by *Powell* and his convictions, even if inconsistent with his acquittal, must be sustained.

## V. SEARCY'S ALLEGATIONS OF TRIAL ERROR

### A. *Testimony of Peter Walsh*

■ At trial, the government called Peter Walsh, outside counsel to SCT during the time of the conspiracy, as a witness to testify about the deceptions foisted on him by many of the principals of SCT. Walsh testified that SCT officials had concealed the "out letters" from him. On cross-examination by Searcy's counsel, however, Walsh testified that in his dealings with Searcy, he found Searcy to be truthful and honest. On redirect examination, the government asked Walsh why SCT had designated Searcy as the individual in charge of dealing with the media in the wake of revelations about the SCT scandal. Before Walsh could answer the question, the government withdrew it. Counsel for Searcy requested that Walsh be allowed to answer the question, and outside the hearing of the jury, Walsh stated that he believed Searcy was given that position because people in SCT perceived him as an honest and trustworthy individual. Searcy's counsel then sought to have Walsh answer the question that the government had withdrawn. The court denied the request because (1) the witness could not state the basis for his belief that Searcy was viewed by others as an honest and trustworthy individual, and (2) the court believed that Walsh had already testified about Searcy's character.

■ Searcy argues that the exclusion of this evidence contravened F.R.E. 405(a), which provides:

In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

Searcy contends that Walsh was precluded from testifying about a character trait of

Searcy's that was critical to his defense. We review the district court's decision not to admit Walsh's answer under an abuse of discretion standard. See *United States v. Leo*, 941 F.2d 181, 196 (3d Cir.1991).

 The question that the government asked Walsh was:

Do you know those other reasons [for putting Searcy in charge of public relations], could you tell us what those other reasons are?

This question plainly does not ask for Walsh's testimony as to reputation or for opinion testimony. Rather, it asks Walsh to describe the motives of other individuals (those inside SCT) for putting Searcy in charge of dealing with the public. No evidence showed that Walsh was competent to testify as to the motives of those other individuals. Even assuming that the question had been phrased to elicit Walsh's opinion, however, such testimony would have been redundant of his prior testimony that Searcy was truthful and a man of integrity, and the court need not have admitted such cumulative evidence. See *United States v. Sullivan*, 803 F.2d 87, 89 (3d Cir.1986). Whichever is the case, the district court did not abuse its discretion in refusing to allow counsel to elicit this response from Walsh in front of the jury.

B. *The Prosecutor's Closing Argument*

 Searcy also argues that the prosecutor's closing argument cast aspersions on defense counsel by suggesting that counsel for both Gross and Searcy were lying to the jury, and that this characterization prevented him from getting a fair trial. See *United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir.1987) (reversing conviction where prosecutor in closing had discredited defense counsel in front of the jury).

 At the end of his closing, the prosecutor stated:

In conclusion, ladies and gentlemen, I'd like to ask you to end the defense charade, all of the posturing, all of the lies, and put the blame where it belongs—

At that point, the court intervened and prevented the prosecutor from continuing

in this vein. The court also instructed the jury to disregard the comments about charades and lying.

Although the government should have avoided this kind of comment in its closing, we believe that, in context, the comment clearly referred to the credibility of the defendants' testimony and not to defense counsel. The government made this comment immediately after summarizing the testimony of Searcy, which it was characterizing as incredible. Also, immediately after making the comment, the government asked the jury to put the blame on the defendants. Nowhere in this portion of the closing did the government refer to defense counsel.

Given our satisfaction that the comments referred to the defendants and not to defense counsel, we must decide whether the government's characterization of the defendants as "liars" and "charaders" prejudiced the defendants sufficiently to warrant a new trial. In *United States v. Swinehart*, 617 F.2d 336, 339 (3d Cir.1980), we held that a prosecutor's statement regarding the credibility of a witness can constitute grounds for reversal only if the defendant can show that he was prejudiced by those comments. Here, the government made the comment at the end of its effort to discredit Searcy's testimony. The comment did not suggest that the prosecutor had any knowledge of the evidence other than what was presented to the jury. See *United States v. Gallagher*, 576 F.2d 1028, 1043 (3d Cir.1978). Instead, it merely suggested that the government believed that it had successfully cast doubt on Searcy's testimony by its summary of his testimony.

 Finally, we note that the district court instructed the jury to disregard the comments, which further weakens Searcy's argument that prejudice resulted from the government's comment. Although in some instances, a cautionary instruction will be insufficient to overcome the prejudice created by a prosecutor's comment, in this case we believe that instruction was sufficient.

In sum, we do not believe that Searcy has demonstrated the requisite prejudice to be granted a new trial.

## VI. WAS RULE 32(c)(3)(D) VIOLATED IN THE SENTENCING OF GROSS?

Finally, we consider Gross's argument that he was sentenced on the basis of evidence on which the district court had specifically foresworn reliance, in contravention of F.R.Cr.P. 32(c)(3)(D). The rule specifies:

If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons or the Parole Commission.

In this case, the presentence investigation report included a section entitled "Victim Impact Statement," in which the government contended that, as a result of Gross's activity, the shareholders of SCT had suffered collective losses of $140,000,000. Gross's counsel made a formal motion to correct the presentence report, pursuant to Rule 32, in which counsel stated that that figure was inaccurate and requested that the court make a finding that the figure was inaccurate. The government offered to provide evidence to demonstrate that $140,000,000 was an accurate estimate of the losses suffered by shareholders of SCT. Although a civil suit in connection with the securities violation had been settled for $13,000,000, the government stated that it was prepared to adduce evidence that actual losses in fact were $140,000,000.

The district court entered an order approximately nine months prior to sentencing stating that it would "not rely upon the $140 million shareholder loss figure cited in the Presentence report as a basis for sentencing." The court therefore declined to hear the government's testimony about the amount of loss caused by Gross. The court stated at a sentencing hearing held immediately prior to the issuance of its order:

All right. Counsel, I will not hear the testimony which the government offers for the following reasons. It does not seem to me appropriate to adopt the Government's theory of restitution. First, because there was a civil action that we settled. And secondly, perhaps more importantly, because I think it would be a violation of due process to impose restitution with respect to the amount of loss sustained by any victim in the words of the statute without affording the defendants the right to try what would have been at least the damages side of this civil action. I do not consider—while I'm sure the defendants' acts caused damage, I do not consider that I have before me without a due process hearing on that subject "the amount of loss sustained by any victim as a result of the offense." Obviously various questions would come up as to when the purchases were made, when the sales were made, if made, reliance and all these other questions.

In addition with respect to Mr. Searcy, he was acquitted of the conspiracy count. And as to the count as to which he was convicted, I'm satisfied the SEC proceedings will result in the appropriate disgorgement, if any, that is required. With respect to its influence on the remaining part of the sentence, I do not need the testimony because its—I do not—I consider that both Mr. Gross and Mr. Searcy have been convicted of, in Mr. Searcy's case a serious offense, in Mr. Gross's case several serious offenses. But I do not think my—the sentence that's ultimately determined for those offenses will be influenced by whether the amount of harm alleged to have occurred as a result of the offenses is 10 or 15 million or 140 million.

**1110**

Consequently, defense counsel and the government proceeded to sentencing on the understanding that the district court would not rely on the $140,000,000 figure.

There was approximately a nine-month delay between this hearing on the amount of loss in September, 1990 and the final sentencing hearing in June, 1991 due in part to the controversy about the Jencks material discussed above. After sentencing Gross, the district court stated:

> The dimensions of the fraud here were enormous and the harm that was inflicted on so many people was enormous, and out of that rises a public interest to be vindicated which cannot be overcome by participation in a community service project.

The court did not mention the $140,000,000 figure. Gross now contends that the district court implicitly relied on that figure during its sentencing, although it did not refer to it explicitly. He argues that such reliance was error given that the court had specifically indicated it would disregard the figure.

We have made clear that Rule 32(c)(3)(D) requires the district court to make a finding as to disputed facts, see *United States v. Gomez*, 831 F.2d 453, 455 (3d Cir.1987), and if the district court does not make such a finding, it is obligated not to rely on the fact in dispute. See *United States v. Blanco*, 884 F.2d 1577, 1583 (3d Cir.1989). Our review of the district court's determination in this regard is plenary. See *United States v. Furst*, 918 F.2d 400, 406 (3d Cir.1990).

Nothing in the record before us indicates that the district court relied on the $140,000,000 in sentencing Gross. Gross's argument ignores the ample and uncontradicted evidence in the record which demonstrated that his actions had caused substantial financial loss. As we have noted, a civil suit related to the SCT scandal had settled for $13,000,000, and other evidence indicated that the actual loss may have been greater, even if substantially less than $140,000,000. Gross never objected to the inclusion of evidence related to these lesser figures in the pre-sentence investigative report. In-

deed, his own motion to contest the $140,000,000 figure conceded that he had agreed to pay the $13,000,000 figure in settlement of a civil suit.

While the district court's rationale is not entirely clear, it appears from the colloquy cited above that the court was relying on the undisputed amount paid out in settlement of the civil action in this case. The essence of the court's statement is encapsulated in the observation that the sentence would be no different if the amount of loss were "10 or 15 million or 140 million." Given the magnitude of a $10,000,000 loss, that statement seems reasonable, and we accept it. Therefore, because the district court did not rely on the $140,000,000 figure, there was no violation of F.R.Cr.P. 32(c)(3)(D).

## VII. CONCLUSION

Because all of the defendants' contentions are without merit, the judgments of sentence against both Gross and Searcy will be affirmed.