NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1654
_____

UNITED STATES OF AMERICA

v.

KAMAL J. JAMES,

Appellant

_____

No. 16-2197
_____

UNITED STATES OF AMERICA

v.

CRYSTAL G. HAWKINS,

Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Crim. Action Nos. 3:14-cr-00020-001 and 3:14-cr-00020-002)
District Judge: Honorable Peter G. Sheridan
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
June 6, 2017
_____

Before: CHAGARES, GREENAWAY, JR., and VANASKIE, *Circuit Judges*.

_____

OPINION[*]

_____

GREENAWAY, JR., *Circuit Judge*.

## I. INTRODUCTION

Appellants Crystal Hawkins and Kamal James were convicted by a jury of conspiracy to defraud the United States, 18 U.S.C. § 286; filing false, fraudulent or fictitious claims, 18 U.S.C. § 287; and mail fraud, 18 U.S.C. § 1341, in connection with a scheme to file tax returns for formerly incarcerated individuals based on invented earnings. Following trial, further proceedings were necessary to calculate the total loss amount, not all of which had been proved at trial. Fourteen months after they were convicted, Appellants were sentenced based on an intended loss of more than $3.5 million. They now appeal, arguing that a good faith instruction to the jury was required, that the court relied on faulty data in reaching its loss calculation, and that their right to be sentenced in a timely manner was violated (James, acting pro se, adds various additional claims). We address each argument in turn and in each instance, will affirm.

## II. BACKGROUND

Appellants operated a business, Release Refunds, which prepared tax returns for former inmates, generally those previously released from New Jersey prisons. Their

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

model was to help file fraudulent returns for taxes paid in connection with their prison employment.

Appellants solicited their clients through word of mouth and by advertising at New Jersey halfway houses. The clients were instructed to provide Release Refunds with their names, identifying information, the dates they were in prison, and their jobs in prison. Release Refunds then sent the client a blank tax return, filled with their name, address and prison job, to be signed, but not dated. The clients never provided information about their actual earnings, hours worked, or withholding amounts. Rather, Appellants would fill in the signed blank tax return with an income amount—based on the faulty premise that inmates earned the minimum wage—and a claim for a refund, then submit the form to the IRS. Appellants would also send their clients substitute W-2 forms which listed wages and withholdings from the period of incarceration; the numbers on these forms were also put forward by Appellants without information from the clients. Appellant Hawkins, a certified tax preparer, was listed as the tax preparer on the forms. As its fee, Release Refunds claimed 25 percent of the refund.

At trial, witnesses testified about 16 refunds filed through Release Refunds, adding up to over $30,000 in losses. In each case, the taxpayer was forced to repay their refund to the IRS, including the fee paid to Release Refunds. One return described at trial was made under a false identity created by investigators at the IRS and the New Jersey Department of Corrections.

Appellants' primary defense at trial was that they mistakenly, but in good faith, believed that their returns were accurate. For example, Hawkins testified that they were

3

never notified by the IRS that the returns they filed were frivolous, and indeed that they stopped filing returns once clients told them that returns had been held as frivolous. The jury returned a guilty verdict on all counts on February 6, 2015.

After trial, the government attempted to establish the full extent of the losses generated by this scheme, which it estimated at over $4 million. The Probation Office was delayed in preparing its presentence report, the first draft of which was disclosed on August 19, 2015, and the final version on October 9. The presentence report was based, in part, on a Government spreadsheet cataloguing each of the returns on which a loss calculation would be based. A sentencing hearing was initially scheduled for October 20, but Hawkins sought discovery of the documents underlying 206 of the returns included in the initial loss calculations. The Government agreed to produce the records, but warned Hawkins that the process might take some time. Those documents were only partly produced by the initial court deadline of November 20, 2015, requiring the further postponement of the scheduled sentencing hearing.

During this period, the Government revised its spreadsheet, eliminating 74 of the returns in which discovery had been ordered and revising figures for some others. A revised spreadsheet was submitted in March 2016, shortly before the sentencing hearing began, which estimated, among other things, a lower restitution figure. The second day of the hearing was then delayed until April 14, 2016, due to the District Judge's illness.

At the hearing, the Government offered testimony from an IRS employee. She explained the IRS process for determining which returns were part of the scheme, which involved collecting all returns associated with Appellants' preparer tax identification

4

number, IP addresses, residential address, or bank account.  The Government also introduced the revised spreadsheets cataloguing each of the identified returns.  The Court credited the Government's witness, despite Appellants' cross-examination.

In reaching its Guidelines calculation, the District Court found that the Government showed an intended loss "based on" the $4.2 million number included in the spreadsheet, but concluded that it did not need to provide a "precisely accurate number" for the loss amount.  JA 1863.  The Court reasoned that "there's no way that any of the evidence, including the issues that were brought forward by Ms. Hawkins, give rise to a level of" error that would bring the loss amount below $3.5 million, where the relevant Guidelines range began.  JA 1863.  However, the Court also granted a downward variance of two levels because it felt that the Guidelines process over-stated the actual amount of loss.  James was sentenced to a term of 96 months' imprisonment, and Hawkins to 48 months' imprisonment.  Each was also ordered to pay over $570,000 in restitution.

### III.    GOOD FAITH JURY INSTRUCTION

Appellants were charged with, and convicted of, 20 counts, across three offenses: conspiracy to defraud the United States, 18 U.S.C. § 286; filing false, fraudulent or fictitious claims, 18 U.S.C. § 287; and mail fraud, 18 U.S.C. § 1341.  They challenge the District Court's decision not to give a separate instruction on the good faith defense to these claims.  "Refusal to give a proposed instruction is reversible error only if the omitted instruction is correct, is not substantially covered by other instructions, and is so important that its omission prejudiced the defendant."  *United States v. Urban*, 404 F.3d

5

754, 779 (3d Cir. 2005). "As on all occasions when we consider jury instructions we consider the totality of the instructions and not a particular sentence or paragraph in isolation." *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995).

Our case law is clear that good faith instructions are not required where the *mens rea* elements of a crime are properly set out. Failure to give a good faith instruction is not an abuse of discretion "where the instructions given already contain a specific statement of the government's burden to prove the elements of a 'knowledge' crime." *United States v. Leahy*, 445 F.3d 634, 651 (3d Cir. 2006) (citing *United States v. Gross*, 961 F.2d 1097, 1102-03 (3d Cir. 1992). "[A] jury finding of good faith is inconsistent with a finding that the defendant acted knowingly and willfully." *United States v. Gross*, 961 F.2d 1097, 1103 (3d Cir. 1992). Here, the jury was properly instructed on the knowledge elements of each offense and the District Court even added a special additional instruction that, in context, approximated a good faith instruction.

With respect to the conspiracy charge, the Court instructed that the Government must prove that "the defendant knew the unlawful purpose of the plan and willfully joined it." JA 1562-63. It further instructed that the Government had to prove that "the defendants knowingly and intentionally joined the agreement," JA 1564, that each defendant "knowingly and intentionally conspired with one other person in this conspiracy," JA 1565, and that it is not enough to prove that "the defendant may have done something that happened to help the conspiracy . . . if he or she did not know of the conspiracy or its objective, or did not intend to join the conspiracy." JA 1566.

6

With respect to the making of false, fictitious, or fraudulent claims, the Court instructed that one element of the offense is that "the defendants presented the claims knowing they were false, fictitious or fraudulent." JA 1569. The Court further explained that "[a] claim is false if it is untrue when made, and was then known to be untrue by the person making it or causing it to be made"; that "a claim is fictitious, if it is not real or if it does not correspond to what actually happened"; and that "[a] claim is fraudulent if it was falsely made or caused to be made with the intent to deceive." JA 1570.

After instructing on the first two offenses, the Court then offered a general instruction on state of mind. It told the jury that "[t]he offenses charged in the superseding indictment require that the Government prove that the defendant acted knowingly with respect to certain amounts of the offense," and that "[c]ertain of the offenses charged in the superseding indictment require that the Government prove beyond a reasonable doubt that the defendant acted intentionally," defining each of those terms. JA 1570-71.

Returning to the third offense, the Court instructed that mail fraud requires proof that the defendants "knowingly devised a scheme to defraud the United States" and that they "acted with the intent to defraud." JA 1572. The Court explained that this requires the Government to prove that defendants "act[ed] knowingly with the intention or purpose to deceive or to cheat." JA 1575.

The Court also noted that aiding and abetting liability is only present "if a defendant intentionally joins with the person to commit a crime" or "willfully directs or authorizes the acts of an agent." JA 1577.

7

Thus, each offense included an instruction on the knowledge element at issue. Each of the convictions was based on a finding of knowing wrongdoing. The District Court was under no obligation to provide an additional good faith defense.

Even so, the Court also addressed the key good faith argument that defendants raised at trial: that they honestly believed that the Fair Labor Standards Act required inmates be paid a minimum wage and that they could prepare tax returns on that basis. The Court instructed that, as a matter of law, that interpretation of the FLSA is incorrect. It went on to say that:

> During the trial, Ms. [Hawkins] testified that she researched and read the Fair Labor Standards Act, and based on her research she concluded that an inmate is not excluded from the definition of employee contained in the Act. However, it is within your discretion to decide whether to believe her statements, and whether she had the intent and knowledge required by all the counts.

JA 1580. In context, this was essentially a good faith instruction: it told the jury that if it believed her testimony that she concluded she was acting lawfully, she lacked the intent and knowledge required for conviction. There was no abuse of discretion in not adding another good faith instruction.

Appellants offer two responses. First, they argue that because the instructions about *mens rea* were spread across many statutes, the instructions were not sufficiently clear. Second, they argue that the Third Circuit's model good faith instruction would have better instructed the jury. But these are objections to the form and styling of the instructions, not their substance. The requested instruction was "substantially covered" by other instructions, and so we find no abuse of discretion. *Urban*, 404 F.3d at 779.

8

Separately, Appellants argue that a higher *mens rea* of willfulness should have been required, as these were, in essence, tax violations. It is true that many tax crimes require this heightened showing, and that many prohibit the same sort of behavior at issue in this case. *See Cheek v. United States*, 498 U.S. 192, 200 (1991) (noting that certain federal criminal tax offenses require proof of specific intent to violate the law). But it is well established that "when conduct runs afoul of more than one prohibition of the criminal law, prosecutors have discretion to choose under which statute to prosecute." *United States v. Sherman*, 150 F.3d 306, 312 (3d Cir. 1998) (citing *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). The requirements of one offense, not charged, are not imported into the charged offense. *See United States v. Anzaldi*, 800 F.3d 872, 880-81 (7th Cir. 2015) (holding that violations of 18 U.S.C. § 287 need not be brought under the tax code or be subject to the tax code's willfulness requirements).

Neither of Appellants' arguments are persuasive. The District Court did not err.

### IV.  LOSS CALCULATION

Appellants challenge the District Court's loss calculation, made at sentencing, as erroneous. "Loss amount is a sentencing fact . . . so it must be found by a preponderance of the evidence." *United States v. Ali*, 508 F.3d 136, 145 (3d Cir. 2007). "The court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 n. 3.C. We review the District Court's factual findings, including its loss calculation, for clear error. *United States v. Dullum*, 560 F.3d 133, 137 (3d Cir. 2009). Thus, we will affirm the loss calculation unless it was "completely devoid of minimum evidentiary support displaying

9

some hue of credibility." *Lehman Bros. Holdings v. Gateway Funding Diversified Mortg. Servs., L.P.*, 785 F.3d 96, 103 (3d Cir. 2015).

At trial, the Government put forward evidence only of a small number of around $30,000 of loss, based on 16 refunds. To establish loss at sentencing, the Government created a spreadsheet of all the fraudulent refunds that it alleged were claimed as part of this scheme, which totaled to over $4.4 million. Appellants now claim that this spreadsheet was so unreliable that the District Court's loss calculation of more than $3.5 million was a clear error.

Notably, Appellants concede that the IRS's underlying procedures for preparing the spreadsheet—which rely on using a series of different identifiers, such as address or bank account number associated with the return, to populate the spreadsheet with relevant returns—were not invalid or unreliable. Rather, they point to a variety of ostensible flaws in the spreadsheet, including data entry mistakes, duplicate entries, and returns that were not part of the scheme in question. This concession makes it very difficult to find clear error—if the Government's basic methodology was sound, the District Court already had some evidentiary basis for relying on that data.

But for each data flaw alleged, there was also evidence that the data were correct or any mistake minimal. For example, Appellants identified alleged duplicate entries, involving the same individual claiming the same refund. But the Government demonstrated that these returns showed different wage and withholding information and presented testimony that the IRS would not consider the returns to be duplicates, with only one exception. Likewise, Appellants point to a data entry mistake where, for one

10

return, the earned income credit was mistakenly entered as $29,000, rather than $290. However, testimony also showed that the spreadsheet included the correct number for the amount of refund—the ultimate figure relevant to the loss calculation.

Appellants also attempt to increase the amount of uncertainty over the reliability of the IRS spreadsheets by pointing to errors that were included but then, after being identified, were corrected. But, as the District Court recognized, these initial errors need not taint the entire process, particularly where evidence was presented showing them to have been largely fixed. If the District Court had an evidentiary basis to find the final spreadsheets on which it relied accurate, that is enough.

At the end of the day, the various issues with the spreadsheets were presented to the Court through an adversarial process. The Government put forward an IRS witness and the spreadsheet data, both of which the Court found "very credible." JA 1860. Appellants cross-examined that witness, raising each of the issues they now raise on appeal. The District Court weighed the evidence, as is its job, and reached a conclusion. Our job is not to second-guess the District Court where, as here, there is a minimum (or more) of evidentiary support.

Only one issue raised on appeal gives us pause, given the deference we owe the District Court's findings of fact. The Government's spreadsheet included roughly 40 returns submitted in North Carolina, unlike the New Jersey returns otherwise at issue. These returns, unlike the New Jersey returns, involved Appellants training people in other states on how to file tax returns for prison inmates and creating a subcontractor-type arrangement with their trainees. Appellants objected at sentencing, arguing that these

11

returns were outside the scheme proven at trial. The District Court did not conclusively rule on whether these returns should be included or excluded in the ultimate loss calculation, though it did state orally that this "scheme seems way different than what had been presented at trial." JA 1662. Moreover, the Government notified Appellants prior to trial about the North Carolina returns, stating that "[t]he Government does not believe that these tax returns are relevant or material to this case as the scheme charged in the Superseding Indictment involves tax returns that you filed in connection with the Release Refunds business on behalf of former prison inmates in New Jersey." JA 1978-79. However, the Government changed position at sentencing, arguing that these returns were relevant.

Regardless of whether these North Carolina returns should have been included, we see no basis for reversal. There is no indication in the record that they were actually included in the Court's loss calculation, nor that if they were, it prejudiced Appellants. The District Court found that the Government showed an intended loss "based on" the $4.2 million number included in the spreadsheet, but concluded that it did not need to provide a "precisely accurate number" for the loss amount. JA 1863. The Court then reasoned that "there's no way that any of the evidence, including the issues that were brought forward by Ms. Hawkins, give rise to a level of" error that would bring the loss amount below $3.5 million, when the relevant guideline range began. JA 1863. Given that the 40 North Carolina returns did not total to more than $100,000, this was, at worst, harmless error. *See United States v. Fumo,* 655 F.3d 288, 310 (3d Cir. 2011) (observing that error is harmless unless difference in loss places defendant into higher offense level).

12

## V.      SPEEDY SENTENCING

Appellants were not sentenced for fourteen months after they were convicted at trial. They claim that this violated their constitutional right to speedy sentencing. We review the District Court's legal conclusion that Appellants failed to establish a violation of their rights to a speedy sentencing *de novo*, but any factual findings supporting that conclusion are reviewed for clear error. *Burkett v. Fulcomer* ("*Burkett II*"), 951 F.2d 1431, 1437-38 (3d Cir. 1991).

Until 2016, the Third Circuit reviewed claims of delays in sentencing under both the Sixth Amendment and the Due Process Clause. *Burkett v. Cunningham* ("*Burkett I*"), 826 F.2d 1208, 1219-21 (3d Cir. 1987). It analyzed claims under both clauses using the same four-factor test, as set forth in *Barker v. Wingo*, 407 U.S. 514 (1972). *Burkett II*, 951 F.2d at 1438.

Last year, though, the Supreme Court held unanimously that the Sixth Amendment provides no guarantee of speedy sentencing. *Betterman v. Montana*, 136 S. Ct. 1609 (2016). However, the Court expressly left open the possibility that due process protects against improper delays in sentencing, noting that "[a]fter conviction, a defendant's due process right to liberty, while diminished, is still present. He retains an interest in a sentencing proceeding that is fundamentally fair." *Id.* at 1617. The Court did not set forth what a due process speedy sentencing claim might consist of, although it suggested that the *Barker* factors might be "[r]elevant considerations." *Id.* at 1618 n.12.

Because the Supreme Court put forward no holding on the availability of a speedy sentencing claim under the Due Process Clause, our prior precedent under the Due

13

Process Clause survives *Betterman*. We have held that due process, specifically, protects against delays in sentencing. *Burkett I*, 826 F.2d at 1221 ("The Due Process clause thus protects not only against delays in trial, including sentencing . . . ."). Moreover, we held that these due process claims are analyzed under the basic framework of the four *Barker* factors. *Id.* at 1222 ("as a general matter, the *Barker* factors should also inform our due process determination"); *Burkett II*, 951 F.2d at 1438 ("We are to assess four factors in determining whether the constraints imposed by speedy trial and due process rights have been honored . . . .") (citing *Barker*, 407 U.S. at 517-38). *Betterman*, which addressed only the Sixth Amendment, does not disturb this precedent.

Of course, *Betterman* might require a shift in our speedy sentencing jurisprudence. Standards that rested on two independent constitutional legs might need reworking now that they stand on only one. But we need not set out a post-*Betterman*, due process-based standard for speedy sentencing claims now. Any new standard, rooted in just one constitutional provision, would be at least as difficult for defendants to meet as a standard rooted in two. And since Appellants' claims fail under the *Barker/Burkett* framework, they would fail under any other test we could set forward.

Thus, for this case, we balance four factors to analyze Appellants' speedy sentencing claim: "(1) length of the delay, (2) reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant." *Burkett II*, 951 F.2d at 1438.

The Government concedes that fourteen months is a problematically long period between conviction and sentencing and at least opens the door to a speedy sentencing claim. Appellee's Br. at 40 (quoting *United States v. Nelson-Rodriguez*, 319 F.3d 12, 60

14

(1st Cir. 2003) ("A fourteen-month delay between the date of conviction and the date of sentencing is long enough to trigger an inquiry into the other *Barker* factors."). That said, it is "not as egregious as others reported," *Burkett II*, 951 F.2d at 1439 (describing a 29-month delay, as compared with delays from 31 months to six years), so when balanced against the other three factors, it does not weigh as heavily as it might.

But while the length of delay cuts for Appellants, the reasons for that delay cuts against them. Most of the delay was either justifiable or outright advantageous to petitioners. The first eight months, from February to October of 2015, were spent waiting for the Probation Office to complete its presentence report and then, after comments from the parties, to finalize that report. Given the extensive evidence required for sentencing that had not been presented at trial, it is no surprise—and not improper—that this process took somewhat longer than usual. Not this entire period was fully excusable. The District Court noted that the "undermanned" pretrial staff contributed to the delay, JA 1618, and our precedent is clear that "a crowded docket" and "court congestion" must be "weighed against the government." *Burkett II*, 951 F.2d at 1439-40; *Burkett I*, 826 F.2d at 1223. But most of these eight months reflect the ordinary speed at which these processes occur in a case like this.

The next period, from October to December, is attributable to Appellants' own discovery motions. This is not a reason for delay about which Appellants can now complain, at least in the absence of some indication that the materials were improperly withheld in the first instance. *Burkett II*, 951 F.2d at 1441 (suggesting that if defendant "contributed to the delay" it would weigh against him). The two-month delay was due to

15

unavoidable scheduling conflicts: first by the standby attorneys, and second when the District Judge was sick.

Finally, roughly six weeks from January to March of 2016 are attributable to the Government, which had not yet completed the discovery productions requested by Appellants. None of these could be described as a "deliberate attempt to delay," *Barker*, 407 U.S. at 531, and only a few months of the delay even count as "neutral" factors to be weighed "less heavily" against the Government. *Id.* Most are "valid reason[s]" that "serve to justify appropriate delay." *Id.*

Turning to the third factor, Appellants only asserted a speedy sentencing claim for the first time in mid-February of 2016, less than a month before the District Court began its sentencing hearing. For a full year, Appellants were either not complaining or themselves seeking additional delay. We assign this "strong evidentiary weight" that for at least much of this period, the delay was not improper. *Barker*, 407 U.S. at 531.

Finally, Appellants cannot show sufficient prejudice. Their brief identifies two forms of prejudice from the delay in sentencing: the harms of being detained in a local jail long-term, including an allegedly poor diet and limited access to the law library, and anxiety. Appellants' claims of anxiety do not tilt the balance in their favor. "[O]nly unusual or specific problems of personal prejudice will satisfy the *Barker* test" and in a post-conviction context, we generally treat a person awaiting sentencing as suffering no unusual anxiety compared to any other convicted defendant with pending post-trial or appellate matters. *Heiser v. Ryan*, 15 F.3d 299, 305 (3d Cir. 1994); *see also Hakeem v. Beyer*, 990 F.2d 750, 762 (3d Cir. 1993) ("Vague allegations of anxiety are insufficient"

16

and "evidence of psychic injury" required). Nothing in this case suggests anxiety out of the ordinary.

We have recognized that there may be cognizable prejudice stemming from being confined to a local jail rather than a state (or, presumably, federal) prison better equipped for long-term incarceration.[1] *Burkett II*, 951 F.2d at 1443. But that, standing alone, does not do enough for Appellants to carry the day. Unlike in *Burkett II*, there are no other forms of prejudice to which it is coupled. *Cf. Hakeem*, 990 F.2d at 761 (distinguishing prejudicial effect of jail time when delay also limited ability to locate witnesses from jail time as a stand-alone form of prejudice). In the post-conviction context, where "most of the traditional interests the speedy trial guarantee is designed to protect," including the prevention of oppressive incarceration, "diminish or disappear altogether," this is not a particularly sizable prejudice.

Moreover, whatever prejudice did arise from this delay was at least partially offset by the substantial benefits Appellants received from delay: additional discovery and the ability to successfully contest certain elements of the Government's loss calculation and reduce the restitution they owed. *Cf. Barker*, 407 U.S. at 521 (stating that delay "may work to the accused's advantage").

---

[1] The Supreme Court in *Betterman* observed that it is "of no constitutional moment" that "detention may occur in a local jail rather than a prison." 136 S. Ct. at 1617 n.9. But this observation goes to the scope of the Sixth Amendment's protections and the existence of a constitutional right to be placed in one facility rather than another. It does not speak to what constitutes prejudice stemming from a due process violation.

17

Balancing the four factors against each other, we see a somewhat lengthy delay that is largely justifiable—as evidenced by Appellants' asserting their rights only at the very end of the 14-month period. This mostly-justified delay imposed only minimal prejudice on Appellants, if any. We therefore will affirm the District Court's finding of no constitutional violation under the *Burkett* standard—and therefore under any standard based in the Due Process Clause.

## VI.    ADDITIONAL CLAIMS RAISED BY JAMES

Appellant James, representing himself pro se, raises a number of additional claims, in addition to joining those pressed by Appellant Hawkins. First, he asserts that the District Court lacked jurisdiction because it was acting "under color of law" and was therefore a "de facto judge" without proper authority. Under the same heading, James asserts that the Government and Court failed to specify what sort of "person" he was, legally speaking. These "sovereign citizen"-inspired claims lack all merit. *See El Ameen Bey v. Stumpf*, 825 F. Supp. 2d 537, 549-50 (D.N.J. 2011) (identifying this use of "color of law" as "nothing but hoaxes making no sense legally"). The federal courts had jurisdiction over this matter, as already noted, and there is no special definition of "person" embedded in 18 U.S.C. § 286.

Next, James claims that the District Court violated his Sixth Amendment right to a speedy trial. At the heart of James' claim is that the speedy trial clock should not have been stopped by his many filings, since the documents he filed were not actually properly

18

formed motions. Under the Speedy Trial Act, pretrial motions stop the clock.[2] 18 U.S.C. § 3161(h)(1)(D). However, this Court has long held that "lack of formality does not preclude [a] request . . . from attaining, for Speedy Trial Act purposes, the status of a pretrial motion." *United States v. Arbelaez*, 7 F.3d 344, 347 (3d Cir. 1993). What matters is if it is the "functional equivalent" of a motion. *Id.*; *cf. United States v. Williams*, 557 F.3d 943, 951 (8th Cir. 2009) ("Nowhere does the statute distinguish between pro se motions and motions filed by counsel, or between meritorious and frivolous motions. The case law is in accord."). Beyond this issue, James presents no reason to upset the District Court's analysis on speedy trial issues.

James argues that the case must be retried for two reasons: first, that he filed the fraudulent returns in good faith; and second, that the Government improperly told the jury in closing that Appellants "kept [the money] for themselves." JA 1541. We interpret the first issue to be substantially the same as Appellant Hawkins' claim for a good faith instruction. As such, our reasoning, analysis, and conclusion are the same. The issue lacks merit. The District Court did not err.

As for the second issue, improper prosecutorial statements warrant a new trial when they "cause[ ] the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v.*

---

[2] Although James asserts a constitutional violation, the Speedy Trial Act was enacted to "effectuate the Sixth Amendment right to a speedy trial" and the 70-day limit at issue in this appeal "exceeds the protections required by the Sixth Amendment." *United States v. Greer*, 527 F. App'x 225, 228 n.3 (3d Cir. 2013), *vacated on other grounds*, 134 S. Ct. 1875 (2014). Thus, here, the Speedy Trial Act analysis suffices.

*Brown*, 765 F.3d 278, 296 (3d Cir. 2014) (alterations in original). Because James did not object contemporaneously, we review for plain error, which requires a showing of "egregious error or a manifest miscarriage of justice" to establish prosecutorial misconduct. *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003). James argues that Release Refunds in fact made quarterly tax payments to the IRS, showing the prosecutor's closing statement to be false. This takes the statement out of context. The prosecutor made this statement in the course of arguing for Appellants' bad faith. He argued that after Appellants learned of the problems with their scheme, they did not go to the IRS or to their clients and attempt to rectify their mistakes; rather, they kept the money and "left all their clients twisting in the wind." JA 1540-41.

In this context, it is immaterial that Release Refunds made some payments to the IRS, for this is not the money that the prosecutor accused Appellants of keeping in his closing statement. This statement did not create a manifest miscarriage of justice and no new trial is required.

Finally, James challenges the District Court's ability to find facts related to the loss amount at a sentencing hearing, rather than at trial before a jury. However, loss amount is not an element of the crime under *Alleyne v. United States*, 133 S. Ct. 2151 (2013), as it does not increase either the maximum or minimum amount of punishment available under the relevant statutes. *United States v. Staton*, 605 F. App'x 110, 117 n.13 (3d Cir. 2015) (holding that loss amount only influences sentencing judge's discretion in imposing an advisory Guidelines sentence).

20

## VI.   CONCLUSION

Because all claims raised only by James fail, and for the reasons provided above regarding the three claims raised jointly by James and Hawkins, we will affirm on all counts.