UNITED STATES of America,

v.

**John B. CORCORAN, et al., Defendants.**

**Crim. No. 91-065.**

United States District Court,
M.D. Pennsylvania.

Dec. 22, 1993.

---

Joseph F. Sklarosky, Albert, Dingle, Russin, Sklarosky, Sieminski & Kamage, Forty Fort, PA, for defendant.

John B. Corcoran, pro se.

House Calls, Inc., pro se.

House Calls Home Health Agency, Inc., pro se.

Dura–Med, Inc., pro se.

Northeast Diagnostic Services, Inc., pro se.

Bal Cor Health Service, Inc., pro se.

Bal Cal Laboratory Services, Inc., pro se.

Barbara Kosik Whitaker, Asst. U.S. Atty., Scranton, PA, for U.S.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

On April 24, 1992, after a lengthy trial, a jury verdict was entered finding the Defendants guilty of Count I, Medicare Fraud, in violation of Title 42 U.S.C. § 1320a–7b(a); Count IV, Medicare Fraud, in violation of Title 42 U.S.C. § 1320a–7b(a) and Title 18 U.S.C. § 2; and Count V, Medicare Fraud, in violation of Title 42 U.S.C. § 1320a–7b(a) and Title 18 U.S.C. § 2. The Defendants were found not guilty on Count II, Conspiracy to Commit Medicare Fraud, in violation of Title 18 U.S.C. § 371 and Count III, Medicare Fraud, in violation of Title 42 U.S.C. § 1320a–7b(b)(2)(A) and Title 18 U.S.C. § 2.

Thereafter, the Defendants filed a Motion for Judgment of Acquittal and a Motion for a New Trial. These Motions were denied and the Appellants filed an appeal on September 8, 1992.

Because of the lengthy illness of one of the court reporters who took the testimony during part of the trial, the complete transcript in this case has not been filed and thus the appeal has not been heard.

The United States Court of Appeals for the Third Circuit granted a motion for an extension of time to file the transcript, but also ordered the parties to proceed as if the transcripts were not available and in accordance with Rule 10(c) Federal Rules of Appellate Procedure.

Federal Rule of Appellate Procedure 10(c) provides as follows:

If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee, who may serve objections or proposed amendments thereto within ten days after service. Thereupon, the statement and any objections or proposed amendments shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the Clerk of the District Court in the record on appeal.

This Court directed the parties to file a statement of the evidence in accordance with Rule 10(c). On March 11, 1993, the appellant filed a "statement pursuant to Rule 10(c), Fed.R.App.P.". In that submission, however, the appellant indicated that it was "impossible for counsel to reconstruct thirteen days of testimony from a complex medicare fraud trial, based on his recollection". Thereafter, on March 17, 1993, the Government filed its submission pursuant to Rule 10(c). The Government in its submission, included a copy of a memorandum it had submitted in opposition to the Defendant's Motion for Bail Pending Appeal. In that Motion, the Government included a lengthy and substantial "Statement of the Case", which is essentially a

reconstruction of the testimony. The Government seeks to have us accept this for a proposed statement of the evidence pursuant to Fed.R.App.P.10(c).

As mentioned earlier, because of the lengthy illness of one of the reporters who served in the course of the trial, some of the testimony has not been transcribed. There have been submissions of various parts of the testimony which were transcribed by other reporters. Rather than delay this matter any longer, it appears most appropriate to proceed pursuant to Rule 10(c).

We have reviewed the submission made by the Government and find the Government's Statement of the Evidence to be in compliance with Rule 10(c) and we will, therefore, adopt that Statement since none other has been submitted and since it appears to be an adequate recollection of the testimony in the case.

APPENDIX

*THE GOVERNMENT'S PROPOSED STATEMENT OF THE EVIDENCE PURSUANT TO RULE 10(c) OF THE FEDERAL RULES OF APPELLATE PROCEDURE*

*INTRODUCTION*

On September 8, 1992, JOHN CORCORAN and several health care related corporations over which he presided, filed a Notice of Appeal from multiple convictions of Medicare fraud.

In view of the fact that transcripts of the proceedings before the District Court are not yet available, on March 1, 1993, the Clerk for the Court of Appeals directed the parties to proceed in accordance with Rule 10(c) of the Federal Rules of Appellate Procedure.[1]

On March 15, 1993, counsel was served by CORCORAN with a statement that simply

fails to comply with the provisions of Rule 10(c) of the Federal Rules of Appellate Procedure. For the reasons which follow, the Government submits its proposed Statement of the Evidence.

*DISCUSSION*

In his Motion for Bail pending Appeal, CORCORAN identified the following issues to be presented on Appeal: (1) the sufficiency of the evidence on all counts of conviction; and (2) alleged trial errors which include the denial of his Motion to Dismiss, the preclusion of certain defense exhibits, the admission of certain testimony by Weinstein, the denial of a good faith instruction and a claim of inconsistent verdicts.

To the extent that a statement of the evidence is necessary to resolve at least some of the issues raised by CORCORAN, the Government respectfully submits a copy of its Memorandum in Opposition to Corcoran's Motion for Bail Pending Appeal. That Memorandum sets forth the facts of the prosecution as recited in the Presentence Report as well as counsel's recollection of those matters which CORCORAN alleges to constitute trial error.

*CONCLUSION*

For the reasons noted, it is respectfully submitted that the Court approve the Government's proposed statement of the evidence.

Respectfully submitted

JAMES J. WEST
United States Attorney

/s/ Barbara Kosik Whitaker

BARBARA KOSIK WHITAKER
Assistant U.S. Attorney

Dated: March 17, 1993

---

1. Rule 10(c) of the Federal Rules of Appellate Procedure provides as follows: If no report of the evidence or proceedings at a hearing or trial was made, or if the transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellate's recollection. The statement shall be served on the appellee who may serve objections or proposed amendments thereto within ten days after service. Thereupon the statement and any objections or proposed statements shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the clerk of the district court in the record on appeal.

**178**

## ATTACHMENT

United States Court of Appeals
for the Third Circuit

Court of Appeal Number 92–7486

United States of America
Appellee

v.

John B. Corcoran, et al.
Appellants.

The Government's Memorandum in
Opposition to Corcoran's Motion
for Bail Pending Appeal

The Honorable Richard P. Conaboy,
Senior Judge.

## TABLE OF CONTENTS

TABLE OF CITATIONS ................................................... 178
STATEMENT OF THE CASE ............................................... 178
STATEMENT OF FACT .................................................. 179
ARGUMENT
 A. SUFFICIENCY OF THE EVIDENCE ............................... 183
 B. ALLEGED TRIAL ERRORS ...................................... 185
CONCLUSION ......................................................... 187
CERTIFICATE OF SERVICE BY MAIL .................................... 187

## TABLE OF CITATIONS

CASES: PAGE:

Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180 (1932) ................... 186
Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084 (1990) ..................... 186
Illinois v. Vitale, 447 U.S. 410, 100 S.Ct. 2260 (1980) ............................. 186
United States v. Felix, ___ U.S. ___, 112 S.Ct. 1377 (1992) ....................... 186
United States v. Greber, 760 F.2d 68 (3d Cir.1985) ............................ 183
United States v. Gross, 961 F.2d 1097 (3d Cir.1992)................................ 187
United States v. Smith, 793 F.2d 85 (3d Cir.1986) ............................... 183

STATUTES:

18 U.S.C. § 371 ........................................................ 176
18 U.S.C. § 1341 ....................................................... 176
18 U.S.C. § 3143 ....................................................... 183
42 U.S.C. § 1320 ....................................................... 176

*STATEMENT OF THE CASE*

On April 2, 1991, a grand jury convened in the Middle District of Pennsylvania returned an Indictment charging CORCORAN and several health care related corporations over which he presides [1] with distinct schemes of

1. The Indictment charged the following corporations: House Calls Home Health Care, Incorporated; House Calls, Incorporated; House Calls Home Health Agency, Incorporated; Dura–Med, Incorporated; Northeast Diagnostic Services, Incorporated; Bal Cor Health Services, Incorporated; and Bal Cor Laboratory Services, Incorporated. Although CORCORAN purported to do business as Bal Cor Laboratories Services, Incorporated, he, in fact, never filed Articles of Incorporation. Consequently, it is not a legal entity and, as to it, the Indictment was dismissed.

Medicare fraud, Title 42, United States Code, Section 1320a–7b (Counts 1, 3, 4 and 5) conspiracy, Title 18, United States Code, Section 371 (Counts 2 and 6) and mail fraud, Title 18, United States Code, Section 1341 (Counts 7 through 12). Also charged in the conspiracy to commit mail fraud and all mail fraud offenses were Arthur Masteller and Warren Goldfeder.

Although joinder of all Defendants and the offenses were proper, on July 8, 1991, the Court granted Goldfeder's motion, unopposed by CORCORAN, to sever the mail fraud offenses (Counts 6 through 12) from the remaining charges against CORCORAN and his corporations. On September 3, 1991, a trial commenced before a jury on the mail fraud offenses. At the conclusion of the Government's presentation of evidence, the Court, citing insufficient evidence of intent to defraud, granted a joint defense motion for dismissal.

On April 6, 1992, a trial commenced before a jury on the remaining Counts. On April 24, 1992, the jury returned verdicts of guilty against CORCORAN and his corporations on Counts 1, 4 and 5. Verdicts of acquittal were returned on Counts 2 and 3.

Following denial of post-trial motions, on August 31, 1992, CORCORAN was sentenced to a 63 month term of imprisonment and he surrendered to authorities on September 25, 1992.

On September 8, 1992, CORCORAN filed a Notice of Appeal.

On September 11, 1992, CORCORAN filed a Motion for Bail Pending Appeal which was denied by the District Court on September 25, 1992.

On October 23, 1992, counsel was served with a Motion for Bail Pending Appeal addressed to the Court. The United States responds in opposition to a grant of that Motion.

*STATEMENT OF FACT*

The Medicare program is a federal health insurance program for individuals 65 or older and certain disabled individuals. It is operated by the Health Care Financing Adminis-tration of the United States Department of Health and Human Services.

There are two parts to the Medicare program. Hospital insurance (Part A) helps pay for in-patient hospital care, some in-patient care in a skilled nursing facility, home health care and hospice care. Medical insurance (Part B) helps pay for doctor services, out-patient hospital services, durable medical equipment (DME), and a number of other medical services and supplies that are not covered by the hospital insurance part of Medicare. In order for a provider to receive reimbursement, all services performed must be authorized by a physician.

Intermediaries handle claims submitted by hospitals, skilled nursing facilities, home health agencies, hospices, and other providers of services. Carriers handle claims for services by doctors and other suppliers covered under Medicare's medical insurance program. In the Commonwealth of Pennsylvania, the United States Department of Health and Human Services administers Part A of Medicare by contract with Independence Blue Cross (intermediary), Philadelphia. Part B is administered by contract with Pennsylvania Blue Shield (carrier), Camp Hill.

Under Part A, a certified home health agency receives payment from Medicare to reimburse the agency for its costs of providing Medicare services. The Medicare Form 485 is used by the home health agency to prescribe a plan of treatment consistent with instructions received from the patient's attending physician. This plan sets forth the various disciplines to be performed including skilled nursing visits, therapies, diagnostic tests, and items of durable medical equipment. This Form must then be signed by the physician and a copy is furnished to Independence Blue Cross. As a provider furnishes services, it submits to Independence Blue Cross Form UB–82 to receive interim payments for the services. The billings are compared with the authorizing Form 485 to ensure that the care provided is consistent with that actually authorized by the attending physician.

At the end of the fiscal year, the home health agency submits a detailed cost report.

This report essentially reflects the total cost of providing Medicare services, including the agency's administrative expenses, less the total interim payments made to the agency as a result of the Form UB–82 submissions throughout the year. The difference between the total cost of providing Medicare services and the total interim payments determine whether Medicare owes additional sums to the agency. If the interim payments exceed the annual cost of providing Medicare services, the agency has received an overpayment and must send that amount back to Medicare.

The cost report requires a home health agency to disclose any affiliation the owner of that agency may have in any "related" organization, which is defined as an any other corporation in which the owner has a financial interest. This disclosure is necessary, in part, to assure that only those administrative expenses (rent, utilities, supplies, telephone, fax, copying, and salary costs) associated with the certified agency, and not other corporations, are reimbursed by Medicare.

Under Part B, a provider of services receives payment from Medicare through submission of Form 1500 to Pennsylvania Blue Shield. With respect to diagnostic tests, once the tests are performed, interpreted, and reported to the authorizing physician, the provider bills the testing through a designated procedure code on the Form 1500. With respect to DME, a certificate of medical necessity (CMN) signed by the prescribing physician must be submitted along with the Form 1500. Pennsylvania Blue Shield then pays a set fee to the provider for each Part B service rendered.

Forms 485, UB–82 and 1500 each require identification of the referring physician, the date service is provided, and a description of the services provided.

On March 7, 1985, House Calls, Incorporated was certified as a home health agency provider entitled to seek reimbursement from Medicare under Part A. JOHN CORCORAN is the chief executive officer and sole stockholder.

In Count 1 of the Indictment, CORCORAN and all of the corporations identified in the Indictment were convicted of making false representations to Medicare in the cost reports submitted for 1987, 1988 and 1989. The cost report consists of numerous schedules and worksheets, including Worksheet A–6, entitled Cost of Services from Related Organizations. On the cost reports submitted for 1987, 1988 and 1989, CORCORAN did not report his five related corporations. The overhead for House Calls, Incorporated and the five related corporations were paid out of the account of House Calls, Incorporated. A portion of the overhead should have been allocated to the related corporations who benefited by sharing the same office space and employees with House Calls, Incorporated. However, the administrative expenses associated with all of these corporations were included in the cost reports of House Calls, Incorporated, resulting in a willful inflation of claimed expenses of approximately $181,901.00 and a total of overpayment, as the result of interim payments, to House Calls, Incorporated of approximately $150,369.00.

CORCORAN accomplished this fraud by willfully failing to disclose related corporations in the cost reports; by instructing employees to conceal the corporate affiliations from auditors and by controlling the material to which auditors had access.

In the annual cost reports, CORCORAN did not list related corporations on Worksheets A–6. In 1989, when he was directly asked by a Medicare auditor about related corporations, he initially denied that he had any. It was not until the auditor asked him to state that in writing that he finally disclosed his relationship to the other corporations.

All of the revenues generated by the related corporations were eventually deposited into the account of House Calls, Incorporated. However, CORCORAN instructed employees Debbie Brandt and Mary Stefanski not to make direct deposits from other corporations into the House Calls, Incorporated account but instead to deposit checks first into his personal account and then into the House Calls, Incorporated account. CORCORAN instructed employees that in this

manner, there would be nothing in House Calls, Incorporated records showing an affiliation with the other corporations. In addition, while auditors were on site, bookkeeper Mary Stefanski was instructed by CORCORAN to conceal checkbooks and other records for related corporations in closed cabinet drawers. Finally, other employees, including Debbie Brandt, Mary Stefanski, Deborah Bobyak, Kimberly Coley, Deborah Ludden, and Cecile White were instructed to answer the office telephone "health services", so that whatever corporation the caller was asking about could respond without making reference to any of the other corporations.

In Counts 2 and 3 of the Indictment, COR-CORAN was charged with conspiracy and with the substantive offense of illegal renumerations.

CORCORAN entered into an unlawful arrangement to pay David Warke, then employed full-time as a social worker by Wilkes–Barre General Hospital, a kickback for referring discharged patients to House Calls, Incorporated for Medicare services. Warke was paid a fixed amount on a monthly basis. To augment proof of CORCORAN's intent to defraud, he deceitfully listed Warke as an employee whose salary was claimed as a reimbursable expense in the cost reports. When auditors asked for documents supporting Warke's position, Kimberly Coley, at CORCORAN's direction, created fictitious contracts of employment and invoices purporting to reflect that Warke, titled a medical social worker-coordinator, had reviewed social worker notes for various patients. These fraudulent documents, used to deceive auditors, were eventually surrendered to the Grand Jury. The unlawful payments to Warke totalled $3,250.00. Blue Cross reimbursed CORCORAN for Warke's purported salary.

In Count 4 of the Indictment, CORCOR-AN and three of his corporations (House Calls Home Health Agency, Incorporated; Northeast Diagnostic Service, Incorporated; and, Dura Med, Incorporated) were convicted of making false representations to Medicare in the billing of Form 1500s which were paid by Pennsylvania Blue Shield. The false representations were that the physicians identified on the Form 1500s had authorized the non-invasive diagnostic testing. The physicians, in fact, had not authorized the testing and consequently had not been provided with test reports so that they would not know of CORCORAN's unlawful activities.

All of the physicians were unaware of CORCORAN's unlawful billing practices. Many physicians testified that had the testing been necessary, they would have performed it personally or, by their direction, the patient would have been referred to a hospital. Other physicians testified that the testing purportedly authorized by them was beyond their discipline and would not have been ordered under any circumstance.

Still other physicians testified that while they had authorized certain testing on one date, they had not authorized additional procedures on a subsequent date. Specifically, these physicians, podiatrists, had authorized CORCORAN to perform dopplers of the lower extremities. The authorized procedure would have included a simple blood pressure reading of the upper extremities to be used as a reference point. CORCORAN however, also billed for the full dopplers of the upper extremities. Had CORCORAN billed the authorized lower and the unauthorized upper doppler studies as one procedure, as they are regarded by the American Medical Association, or as two procedures performed on the same date, he would have received reimbursement for only one study. However, CORCORAN billed the unauthorized upper doppler as having been performed on a subsequent date to enhance his reimbursement. Moreover, the upper dopplers for which CORCORAN billed were not ever performed as the data needed to interpret the studies was never provided to the interpreting physician. Fraudulent billings to Pennsylvania Blue Shield amounted to $239,160.00.

CORCORAN directed his administrative assistant, Kimberly Coley, and his director of nursing, Deborah Ludden, to instruct all nurses to include specific wording on all Form 485 plans of treatment which he would later rely upon as orders from the physicians for these diagnostic tests. On occasion, this

wording was even added after the physicians' signatures. For example, CORCORAN instructed nurses to ensure that all Form 485s contained the wording "CP/PV assess", which he later relied upon to justify conducting doppler studies. Doctors and registered nurses testified at trial that the "CP/PV assess" required no more than listening to the heart and lungs with a stethoscope, taking pulse and blood pressure readings, and palpitating for edema. As another example, employees were instructed to place "RT evaluation" on all Form 485s, which CORCORAN later relied upon to justifying conducting pulmonary function studies. Doctors testified that "RT evaluation" required no more than respiratory therapy.

The extent of CORCORAN's criminal activity was evidenced by the testimony at trial of 15 physicians concerning over 800 unauthorized diagnostic procedures for which CORCORAN received illegal reimbursement. The investigation identified 11 other physicians whose similar testimony concerning a proportionate number of unauthorized studies was not used at trial due to redundancy.

In Count 5 of the Indictment, CORCORAN and one of his corporations (Dura–Med, Inc.) were convicted of making false representations to Medicare in the billing of the Form 1500s which were paid by Pennsylvania Blue Shield. The false representations were that the physicians identified on the Form 1500 had prescribed items of DME described on the forms and that these items had been furnished to patients. The physicians, in fact, had not prescribed the items of DME. Under CORCORAN's direction, signed CMNs which accompanied the Form 1500s were altered by employee Cecile White, utilizing white-out, to delete non-reimbursable DME prescribed by the physicians and were rewritten to describe other items which would and did qualify for reimbursement but which were not provided to the patients. In an attempt to conceal the alteration, the altered forms were xeroxed and submitted with the billing forms for payment.

To augment proof of CORCORAN's intent to defraud, the evidence demonstrated a classic double billing scheme, in which COR-CORAN, after submitting the Form 1500s to Pennsylvania Blue Shield, then requested reimbursement for the DME actually prescribed by the physician by including these items in the cost report submitted by House Calls, Incorporated to Independence Blue Cross. These claims were ultimately denied when it was learned that the Pennsylvania Blue Shield had already paid for similar, but unauthorized equipment. CORCORAN submitted a total of $19,187.90 in fraudulent bills.

During 1988 and 1989, CORCORAN received from Part B, payments totalling $38,719.00 to Dura–Med, Incorporated for DME furnished to House Calls, Incorporated patients. It is the Government's position that nearly all of these items were duplicately billed to Part A through the House Calls, Incorporated cost reports.

In Counts 6 through 12 of the Indictment, CORCORAN, along with Arthur Masteller and Warren Goldfeder, was charged with conspiracy and with the substantive offenses of mail fraud.

CORCORAN caused false statements to be made to Pennsylvania Blue Shield private insurance (not Medicare) in order to receive payments to which he was not entitled. Under the laws of the Commonwealth of Pennsylvania, Blue Shield private insurance can only enter into contracts with, and reimburse for services provided by, licensed physicians or for services performed under the direct personal supervision of licensed physicians. Thus, unlike Medicare, CORCORAN's diagnostic testing corporation, Northeast Diagnostic Services, Incorporated, was not eligible for reimbursement from Pennsylvania Blue Shield private insurance.

CORCORAN, therefore, entered into a scheme whereby Doctor Warren Goldfeder, a licensed radiologist under contract with Pennsylvania Blue Shield, utilizing his provider number, agreed to submit bills for tests which had purportedly been conducted by CORCORAN's company to Pennsylvania Blue Shield private insurance. However, these bills represented that Goldfeder had either conducted the tests described on the forms or that they were performed under his close personal supervision, neither of which

was true. When Goldfeder received payment, he retained a flat fee of 10% and then forwarded the balance to CORCORAN. Neither CORCORAN nor Goldfeder was entitled to the reimbursement for the tests purportedly conducted by CORCORAN's company. Further, there was testimony that many of the tests had not been authorized by those listed as the referring physicians. Fraudulent billings and reimbursements totalled $43,377.25.

## ARGUMENT

The relevant provision so the Bail Reform Act of 1984 instructs that a person who has been convicted and sentenced to a term of imprisonment shall be detained pending appeal unless the Court finds (1) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released pursuant to Section 3142(b), (c), and (2) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in a reversal, an order for a new trial, or a sentence that does not include a term of imprisonment, or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process. Title 18, United States Code, Section 3143(b).

Although CORCORAN's assertion that he is neither likely to flee nor pose a danger is not in serious dispute, incarceration is nevertheless appropriate in full view of the fact that the central purpose of the appeal is delay: for the reasons noted in this Memorandum, the issues to be raised are clearly frivolous. *United States v. Smith,* 793 F.2d 85, 88 (3d Cir.1986) *cert. denied* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 832 (1987).

### A. Sufficiency of the Evidence

CORCORAN alleges that the evidence is insufficient to sustain his convictions. Thought CORCORAN generally asserts insufficient evidence on all counts of conviction, his Brief controverts only the evidence presented in Count 4. Nevertheless, counsel demonstrated and the District Court proper-

ly concluded that the evidence is wholly sufficient to sustain the convictions.

Under all of the counts of conviction, the Government was required to establish the following elements: first, that false statements or representations were made in claims for payment (cost reports, Forms 485 and 1500) to Medicare; second, that the false statements or representations were made willfully and knowingly; and third, that the false statements or representations were material to whether or not payment would be made in the amount or to the extent claimed. With respect to the final element, in view of the evidence that CORCORAN's unlawful activities (fraudulent concealment of the administrative expenses of corporations not entitled to Medicare reimbursements on cost reports, unauthorized testing billed on the Form 1500s, alteration of CMNs to include unauthorized items of DME billed on other Form 1500s) were all intentionally calculated to deceptively influence Medicare's decision as to entitlement to funds, the Court properly instructed the jury that the statements or representations charged in the Indictment were material. *See United States v. Greber,* 760 F.2d 68, 73 (3d Cir.1985) *cert. denied* 474 U.S. 988, 106 S.Ct. 396, 88 L.Ed.2d 348 (1985).

### (i). Count 1—Medicare Fraud: Cost Reports

As previously noted, other than a general assertion of insufficient evidence, CORCORAN makes no attempt to substantiate his allegation with respect to Count 1. That is because he cannot. The evidence overwhelmingly establishes that CORCORAN intentionally and fraudulently failed to disclose that he was the owner of five other corporations whose administrative expenses were unlawfully claimed as those of House Calls, Incorporated, in the cost reports submitted for reimbursement to Medicare (Part A—Independence Blue Cross) in 1987, 1988 and 1989. The intentional inflation of these expenses in the amount of $181,901.00 resulting in a total overpayment of $150,369.00. CORCORAN accomplished the fraud by deliberately failing to disclose related corporations, both on the cost reports as well as in questioning by auditors, by instructing employees

to conceal corporate affiliations and by controlling the material to which auditors had access.

At trial, CORCORAN claimed that he was unaware of the disclosure requirement for related organizations or the concomitant responsibility to allocate overhead expenses among the corporations to assure that only those associated with House Calls, Incorporated, the sole corporation entitled to seek reimbursement from Medicare, were included in the cost reports. CORCORAN's unsupported claim was soundly rejected as contrived in full view of the evidence that he rejected consultant advice to allocate expenses in favor of knowingly concealing corporate affiliations from auditors to unlawfully obtain reimbursements to which he was not entitled.

### (ii). Count 4—Medicare Fraud: Unauthorized Testing

The evidence overwhelmingly establishes that CORCORAN unlawfully billed Medicare (Part B—Pennsylvania Blue Shield) for purported non-invasive diagnostic testing which had not been authorized by licensed physicians. Fourteen of fifteen physicians testified in unequivocal terms that the tests attributed to them were not, in fact, authorized. Contrary to CORCORAN's claim, the fact that no physician received a report for over 800 purported tests was not the sole predicate for the physicians' conclusions. The physicians were decisive in their testimony for had the tests been medically necessary, the physicians would have performed them personally, or by their direction, the patient would have been referred to a hospital. Other physicians testified that the testing purportedly authorized by them was beyond their discipline and would not have been ordered under any circumstance. Still other physicians, podiatrists, testified that while they had authorized certain testing on one date, they had not authorized additional procedures on a subsequent date.

One physician, Doctor Stanish, testified on direct that he had not authorized audiometry studies for patient Bogart. On cross-examination, when presented with a copy of a Form 485, dated October 2, 1988, Defendant's Exhibit 30, which appeared to list audiometry studies, Doctor Stanish allowed that it was possible that he had ordered the tests but received no report. On re-direct, Doctor Stanish acknowledged that the direction to perform the studies was written in a script different from that which appeared on the remainder of the Form 485 and was suspiciously squeezed between the lines of other directions. Doctor Stanish further testified that an original Form 485, covering the period September 13, 1988 through November 13, 1988, Government's Exhibit IV–ST–2.1, did not include authorization for audiometry studies. Given the substantial evidence that CORCORAN readily resorted to forgery, falsification and alteration of documents, the jury reasonably inferred that the copy of the Form 485 identified as Defendant's Exhibit 30 was fraudulent either in its creation or as altered to include the unauthorized studies. Either inference supports the jury's verdict.

CORCORAN's assertion that two physicians lost patient files and therefore could not testify concerning the contents of the files is a deliberate distortion of the evidence. When Doctor Stanish was cross-examined concerning patient Grover Ernest, he testified he had no file as Ernest was never his patient. The Form 485, prepared by CORCORAN, listing Doctor Stanish as the referring physician and the resultant bill for testing to Medicare were wholly fraudulent. The same is true with respect to the cross-examination of Doctor Brady. He testified he had no charts for 3 patients. However, Doctor Brady testified that he did not need to see the 3 charts because he knew that he never authorized pulmonary function testing from CORCORAN, as Doctor Brady owns the equipment and would have performed the tests himself had they been medically necessary. Again, the Form 485, prepared by CORCORAN, listing Doctor Brady as referring physician and the resultant bills to Medicare were wholly fraudulent.

CORCORAN's allegation that the podiatrists had authorized upper as well as lower doppler studies and that the reports of Doctor Kasulke, the interpreting physician, reflected results for both procedures is sheer

distortion of the evidence. While employees testified that they were routinely instructed to include "CP/PV assess" on all Form 485s so that in case of an inquiry CORCORAN could rely on that as authorization for testing, all physicians testified that "CP/PV assess" required no more than listening to the heart and lungs with a stethoscope, taking pulse and blood pressure readings, and palpitating for edema. In short, an upper doppler study was never authorized: a simple blood pressure reading of the upper extremities to be used as a reference point was all that was required and that reference is reflected on the reports of Doctor Kasulke. Doctor Kasulke was never furnished with the data needed to interpret the purported upper doppler studies. In short, though billed for, the upper dopplers, not authorized by any physician, were never ever performed.

### (iii). Count 5—Medicare Fraud: Unauthorized Equipment

As previously noted, other than a general assertion of insufficient evidence, CORCORAN makes no attempt to substantiate his allegation with respect to Count 5. That is because he cannot. The evidence overwhelmingly establishes that CORCORAN unlawfully billed Medicare (Part B—Pennsylvania Blue Shield) for purported provision of items of DME which he represented had been prescribed by licensed physicians. Quite to the contrary, physicians had prescribed provision of relatively unsophisticated items of DME which CORCORAN knew would not qualify for reimbursement. CORCORAN directed the alteration of the CMNs previously signed by physicians so that the prescribed item was whited-out and replaced by a more sophisticated item which would and did qualify for reimbursement but which was not provided to patients. The original altered CMN was then copied to preclude inquiry about the white-out and the copy was submitted along with the billing documents. Many of the original altered CMNs, filed with patient records, though subpoenaed by the Grand Jury, were not produced but were later seized from CORCORAN pursuant to a judicially approved search warrant.

To augment proof of CORCORAN's intent to defraud, the evidence demonstrated that he had the audacity to include the items actually prescribed by physicians (but whited-out) for reimbursement in the cost reports submitted to Medicare (Part A—Independence Blue Cross). These claims were ultimately and justifiably denied when it was learned that Medicare (Part B—Pennsylvania Blue Shield) had reimbursed CORCORAN for similar (but unauthorized and undelivered) equipment.

At trial, CORCORAN claimed that his employees were responsible for the admitted alteration. Based on the testimony of several employees, CORCORAN's unsupported claim was soundly rejected as contrived.

### B. Alleged Trial Errors

In addition to his sufficiency claims, CORCORAN advances several allegations of error. For the reasons which follow, counsel demonstrated and the District Court properly concluded the allegations to be without merit.

### (i). Motion to Dismiss—Double Jeopardy

Following the initial trial of the mail fraud offenses, which involved a scheme to defraud Pennsylvania Blue Shield private insurance (not Medicare), CORCORAN filed a Motion to Dismiss the remaining counts of the Indictment alleging double jeopardy. Without serious review of either the remaining offense conduct involved in the distinct schemes to defraud Medicare or the discovery provided, CORCORAN capriciously alleged that the prosecution "will be offering much of the same testimony and many of the same witnesses to establish its case. In fact, the second trial will require relitigation of factual issues resolved by the first trial". Memorandum in Support of Motion to Dismiss, page 3.

Following a response by the Government that the remaining counts involved entirely distinct schemes to defraud Medicare, on February 24, 1992, the Court declined to grant a dismissal.

CORCORAN's post-trial assignment of error in the Court's ruling is nothing less than a deliberate failure to comprehend the evi-

dence as double jeopardy concerns are nowhere implicated in this prosecution.

Elementally, the double jeopardy clause protects a defendant from successive prosecutions for the same offense. Theoretically, since it has no application to this prosecution, several offenses may arise from the same act or series of acts. Consequently, the Supreme Court historically instructed that a single act may be prosecuted and punished under different statutory provisions if each offense required proof of an element which the other offense did not. *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). Similarly, a conviction for a lesser included offense may bar subsequent prosecution on a more serious charge. *See Illinois v. Vitale,* 447 U.S. 410, 420–421, 100 S.Ct. 2260, 2267–2268, 65 L.Ed.2d 228 (1980). In *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the Supreme Court appeared to announce that a subsequent prosecution is barred if, to establish an essential element of the offense charged, the prosecution will prove conduct that constituted an offense for which a defendant was previously prosecuted. However, the Supreme Court recently declined to construe *Grady,* the sole authority cited by CORCORAN, so expansively in *United States v. Felix,* 503 U.S. 378, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992). Noting that mere overlap in the proof between two prosecutions does not establish a double jeopardy violation, the Supreme Court held that the double jeopardy clause did not bar a conspiracy prosecution which was based on conduct (overt acts) for which a defendant had been previously convicted.

As previously noted, the initial trial of the mail fraud offense involved a scheme to defraud Pennsylvania Blue Shield private insurance. Since neither CORCORAN nor any of his corporations could qualify as a provider entitled to seek reimbursement from Pennsylvania Blue Shield private insurance, COR-CORAN entered into an unlawful agreement with Doctor Goldfeder to use his provider number to seek reimbursement. The fraud consisted of the representations, set forth in the Form 1500s mailed to Pennsylvania Blue

Shield private insurance, that Goldfeder had interpreted tests, when, in fact, he did nothing and that CORCORAN, through Northeast Diagnostic Services, Incorporated, had purportedly conducted authorized testing, when, in fact, the physicians identified as referring physicians did not authorize testing.

The second trial of the Medicare fraud counts of the Indictment involve distinct schemes to defraud Medicare, both Part A, Independence Blue Cross and Part B, Pennsylvania Blue Shield. CORCORAN engaged in an identical pattern of conduct, billing for tests and equipment not authorized by licensed physicians. Though several of the same physicians testified in both trials, their testimony in the second trial concerned purported authorization for testing listed in Form 1500s (purportedly interpreted by Doctor Kasulke) *totally distinct* from the purported authorization for other testing (purportedly interpreted by Doctor Goldfeder) listed in the *different* Form 1500s involved in the initial trial. That is, none of the evidence adduced by the Government in the initial trial was introduced in the second trial to establish any element of the wholly distinct offenses. There are simply no double jeopardy considerations before the Court.

### (ii). Preclusion of Defense Exhibits

In early 1989, as the Grand Jury commenced its investigation of CORCORAN's pervasive unlawful activities, comprehensive subpoenas were served on CORCORAN. Relevant to the inquiry before the Court, the Grand Jury requested patient files, including all original Form 485s and reports of testing.

By the end of May, 1989, CORCORAN represented that he had produced the documents subpoenaed by the Grand Jury. After review of those documents, it was determined that all records were not produced. When informed of the omissions, counsel for COR-CORAN advised that all documents in COR-CORAN's possession had been produced.

While conducting interviews of CORCOR-AN's employees, in June, 1989, the Federal Bureau of Investigation learned that COR-CORAN was deliberately failing to produce subpoenaed documents. After learning the precise location of some of the documents, on

June 15, 1989, a judicially approved search warrant executed at the offices of House Calls, Incorporated resulted in the seizure of many original CMNs and Form 485s.

During the initial trial of the mail fraud offenses, counsel learned that CORCORAN was in possession of other subpoenaed documents. On repeated occasions in preparation for the second trial, counsel renewed her request for any and all additional subpoenaed documents. Counsel for CORCORAN advised that all subpoenaed documents in COR-CORAN's possession had been produced.

Counsel seriously doubted the veracity of CORCORAN's representation and informed the Court, during numerous pre-trial conferences, that the Government would move to preclude use of any subpoenaed document which had not been produced. Consequently, the Court directed CORCORAN to disclose any and all subpoenaed documents which had not been produced. CORCORAN did not produce a single document.

At various times during the trial, COR-CORAN had the audacity to attempt to cross-examine witnesses with subpoenaed original documents which had not been produced. The Court properly precluded use of these documents.

CORCORAN's deliberate conduct was a willful contempt and an obstruction of justice. CORCORAN intentionally defied the authority of the Grand Jury as well as the Court. Preclusion was a wholly appropriate exercise of the District Court's duty to enforce the orderly administration of justice. *See e.g.,* Rule 16(d)(2), Federal Rules of Criminal Procedure.

It must be noted that the proffered Exhibits which the Court precluded, contrary to CORCORAN's assertion, do not reflect the physicians' authorized testing. As previously noted, no physician authorized the over 800 purported tests for which CORCORAN billed.

### (iii). Testimony of Debbie Weinstein

Debbie Weinstein testified, in part, that the cost reports for 1987, 1988 and 1989 were all settled and that CORCORAN had no pending administrative appeals. On cross-examination, Weinstein was asked if she would be surprised to learn that CORCOR-AN, during a recess had, as the result of a telephone call, been advised that the cost report for 1987 was scheduled for administrative review in August, 1992. Weinstein replied that, indeed, she would be surprised.

When Weinstein was recalled as a witness by the prosecution, she was asked if she recalled the concluding exchange with counsel for CORCORAN regarding the 1987 cost report. In an attempt to establish that CORCORAN had misrepresented the administrative status of that cost report, Weinstein was asked what, if anything, she did as the result of that exchange. When Weinstein began to testify that she consulted the National Review Board, counsel for CORCOR-AN objected on the ground of hearsay and the District Court sustained the objection. Had Weinstein's answer been allowed, the jury would have learned that no hearing was scheduled because CORCORAN had refused all certified correspondence from the Board. During trial, CORCORAN telephoned Mr. Bater and sought to accept the previously returned correspondence by asking Mr. Bater to fax a copy of the letter to the Court-house.

Clearly, CORCORAN's assignment of error in the admission of testimony that was precluded is frivolous.

### (iv). Denial of Good Faith Instruction

At the conclusion of the evidence, counsel for CORCORAN, terming the proposed instructions filed by the Government prior to trial a fair statement of the law, declined the opportunity to present any proposed instructions.

At the conclusion of the District Court's charge, counsel for CORCORAN requested a good faith instruction. In view of the District Court's adequate charge that the Government was required to prove that COR-CORAN acted willfully and knowingly in committing the offenses, the District Court properly declined the requested instruction. *See United States v. Gross,* 961 F.2d 1097, 1102 (3d Cir.1992).

188

### (v). Inconsistent Verdicts

CORCORAN alleges that the verdicts of conviction are inconsistent with the verdicts of acquittal. Specifically, CORCORAN asserts that his conviction for Medicare fraud with respect to the cost reports (Count 1) is inconsistent with the acquittal on the conspiracy and substantive offenses involving the illegal renumeration to David Warke (Counts 2 and 3) in view CORCORAN's inclusion of Warke's salary as a reimbursable expense in the cost reports. CORCORAN deliberately distorts the evidence.

Count 1 charged CORCORAN with making false representations in the cost reports that the administrative expenses included in those reports were solely those of House Calls, Incorporated, the sole certified provider when, in fact, they included the expenses of all of CORCORAN's corporations.

Counts 2 and 3 involved a scheme by CORCORAN to pay Warke a kickback (an illegal renumeration) for referring discharged patients to the care of House Calls, Incorporated. To augment proof of CORCORAN's fraudulent intent, the evidence established that CORCORAN disguised the illegal renumeration as a salary payment to Warke and created fictitious documents to deceive auditors from discovering the illegal renumeration.

Theoretically, CORCORAN could have been charged with the additional fraud with respect to inclusion of Warke's purported salary as a reimbursable expense in the cost reports. He was not; consequently the verdicts are not inconsistent.

### CONCLUSION

For the reasons noted in this Memorandum, CORCORAN's appeal is solely for the purpose of delay and raises no significant question of law in fact. CORCORAN's conviction is more likely than any other event to be affirmed. Accordingly, CORCORAN has not demonstrated entitlement to bail pending appeal.

Respectfully submitted
JAMES J. WEST
United States Attorney
/s/ Barbara Kosik Whitaker
BARBARA KOSIK WHITAKER
Assistant U.S. Attorney

Dated: October 29, 1992