**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 19-2283, 19-2399, 19-2667
_____

UNITED STATES OF AMERICA

v.

DAJWAN WARE,
              Appellant in No. 19-2283

ROBERT A. ELLIOTT, SR.,
              Appellant in No. 19-2399

JUSTIN LOVE,
              Appellant in No. 19-2667
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 3:17-cr-0051-004 (Ware), 3:17-cr-0051-002 (Elliott), 3:17-cr-0051-003
(Love))
District Judge:  Honorable Peter G. Sheridan
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
(October 23, 2020)

Before:  CHAGARES, GREENAWAY, JR., and NYGAARD,
*Circuit Judges.*
(Filed: June 3, 2021)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

GREENAWAY, JR., *Circuit Judge.*

Appellants Robert A. Elliott, Sr., Justin Love, and Dajwan Ware were convicted of various federal crimes in connection with a dogfighting conspiracy. The conspiracy was uncovered by federal agents monitoring wiretaps authorized as part of an investigation into Anthony "Monte" Gaines. Over the course of six weeks beginning in October 2015, agents intercepted several days' worth of conversations between Mr. Gaines and others, including Mr. Ware and Mr. Love, regarding various aspects of the dogfighting venture. These revelations led to a multi-district investigation into the dogfighting activity, which resulted in several convictions, including Appellants'.[1] The trial evidence showed that all three Appellants maintained dogs that were bred, trained, and kept for fighting; that Mr. Ware intended to enter at least one dog in a fight; and that Mr. Love actually entered dogs in fights, one of which was recorded in videos found on his cell phone. Further, possession of certain dogs passed between Appellants and their co-conspirators at various times.

Each Appellant now challenges his conviction. Mr. Ware and Mr. Elliott also challenge their sentences. For the reasons set forth herein, we will affirm the judgment of conviction of each Appellant.[2]

---

[1]     Robert Arellano was a co-conspirator tried with Appellants. He was also convicted at trial; he does not appeal his conviction or sentence. Several defendants, including Mr. Gaines, pleaded guilty to crimes related to the conspiracy.

[2]     The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## I.      Appellant Ware

### A.      Background

Mr. Ware resided in Fort Wayne, Indiana. In June 2016, Agent Christopher Golightly signed an affidavit in support of a search warrant of Mr. Ware's house, which was subsequently executed. Agent Anthony Ruffini wrote the affidavit, though this fact was not discernible from the face of the affidavit. When the search warrant was executed, agents found two dogs housed in a manner consistent with their use in dogfighting, as well as dogfighting paraphernalia and other evidence related to dogfighting.

Mr. Ware was subsequently charged and tried for conspiracy. The evidence at trial showed that Mr. Ware had received a fighting dog from Mr. Gaines and co-conspirator Frank Nichols; that Mr. Ware had received a dog from co-conspirator Arellano; and that Mr. Ware and Mr. Gaines had exchanged information related to dogfighting.

Another development at trial was Agent Golightly's admission that the search warrant had been ghostwritten by another agent. Mr. Ware moved for a mistrial, asserting that the omission of this information rendered the search warrant defective under *Franks v. Delaware*, 438 U.S. 154 (1978). The District Court denied his motion.

Mr. Ware was convicted of (i) conspiracy to sponsor and exhibit dogs in animal fighting ventures, contrary to 7 U.S.C. § 2156(a)(1) and 18 U.S.C. § 49 and in violation of 18 U.S.C. § 371; and (ii) conspiracy to sell, buy, possess, train, transport, deliver, and receive dogs for purposes of having the dogs participate in animal fighting ventures,

3

contrary to 7 U.S.C. § 2156(b) and 18 U.S.C. § 49 and in violation of 18 U.S.C. § 371. At sentencing, the District Court varied upward from the top of the guidelines range—fourteen months—to impose a sentence of twenty-four months.

On appeal, Mr. Ware claims (1) that the search warrant was invalid, so the District Court should have granted his motion for a mistrial, and (2) that the District Court erred in varying upward at his sentencing because the variance was based solely on the nature and circumstances of the offense, was unsupported by evidence, and was excessive.

B.    Validity of Search Warrant

Where a district court has denied a defendant's motion for mistrial, we review that decision for abuse of discretion. *United States v. Diaz*, 592 F.3d 467, 470 (3d Cir. 2010). Here, the alleged trial error is a failure to suppress evidence. We exercise plenary review over the legal determinations pertaining to the suppression of evidence, and we review the predicate factual findings for clear error. *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

When Agent Golightly took the stand, he disclosed for the first time that the affidavit in support of the search warrant application had been written by Agent Ruffini and that he had signed the document without verifying most of the information contained therein. The affidavit stated that the affiant was "familiar with the facts set forth herein based on [his] personal observations, or information provided to him by other law enforcement officers participating in this investigation," and based on his "review of documents, reports, and photographs." Ware App. 39–40. When cross-examined, however, Agent Golightly admitted that he had not independently reviewed documents,

4

reports, or photographs, other than Mr. Ware's driver's license. Indeed, he did no independent investigation prior to signing the search warrant other than surveilling Mr. Ware's house to confirm that Mr. Ware lived there.

We will affirm the denial of a mistrial. The fruits of a search must be suppressed if a defendant shows that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the [search] warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." *United States v. Brown*, 3 F.3d 673, 676 (3d Cir. 1993) (quoting *Franks*, 438 U.S. at 155–56). When an officer "recklessly omits facts that any reasonable person would know that a judge would want to know," this rises to "reckless disregard for the truth." *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000).

Mr. Ware characterizes the omission here thus: "none of the substantive information in the affidavit was based on Golightly's personal knowledge, but rather what Agent Anthony Ruffini told Golightly." Ware Br. 12. We need not determine whether Agent Golightly's omission (or misrepresentation regarding the affiant's review of reports and documentary evidence) constitutes a knowingly false statement or a reckless disregard for the truth because it was not a predicate to the probable cause finding. The Supreme Court has held that "[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *United States v. Ventresca*, 380 U.S. 102, 111 (1965). Thus, we find that if the affidavit had fully and completely disclosed Agent Ruffini's role and the nature and extent of Agent Golightly's investigation, this

5

information would not have affected the probable cause finding. *See United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) ("In the end, the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original probable cause finding.").

Because the omission here did not impact the probable cause determination, the search warrant was valid; the District Court did not abuse its discretion by denying Mr. Ware's motion for a mistrial.

C.    Upward Variance

We review sentences for abuse of discretion. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). "[A]bsent any significant procedural error, we must 'give due deference to the district court's determination that the § 3553(a) factors, on a whole,' justify the sentence." *Id.* at 568 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

Mr. Ware argues that the District Court's upward variance violates the precept that sentencing must be individualized. Mr. Ware underscores that if the nature of the crime were relied upon to justify an upward variance (as he claims transpired here), such a variance would be proper in every dogfighting case. He urges that in this particular case, "there was nothing remotely suggesting that [he] participated or was engaged in the sort of extreme dogfighting violence justifying an upward departure as required by"

6

Application Note 2 of the Guidelines Manual.[3] Ware Br. 20. He also submits that he "was not involved in the conspiracy to the extent of the other co-defendants, and had a minimal criminal record confined to one drug conviction years ago." Ware Br.18.

The District Court, however, explained its basis for the variance in some detail, explicitly tying it to the circumstances of Mr. Ware's individual case. In addition to stating that it had considered the factors set forth at 18 U.S.C. § 3553(a), the District Court demonstrated this consideration. It read into the record excerpts of letters showing the positive and commendable "history and characteristics of the defendant," which it apparently credited,[4] and it pinpointed evidence supporting its belief that "the nature and circumstances of the offense" warranted a variance. *Id.* § 3553(a)(1).

The District Court emphasized that there was evidence of Mr. Ware's "significant" and "substantive[]" involvement in the dogfighting venture, as well as "evidence that this dogfighting venture was an ongoing activity in Mr. Ware's life." Ware App. 15, 16. These determinations were based on, inter alia, (1) the fact that Mr. Ware had taken possession of a dog named "Bubbles" from Mr. Gaines and Mr. Nichols, with the

---

[3]    This Application Note states that "an upward departure may be warranted" if "the offense level determined under this guideline substantially understates the seriousness of the offense," as where the offense involves extraordinary cruelty or animal fighting on an exceptional scale. U.S. SENT'G GUIDELINES MANUAL § 2E3.1 n.2 (U.S. SENT'G COMM'N 2018). The increased sentence here constituted a variance based on the factors set forth in 18 U.S.C. § 3553(a), not a departure, and therefore this Application Note is inapplicable.

[4]    The District Court acknowledged that "there are so many good things about . . . Mr. Ware[] that you can't ignore them." Ware App. at 17. Yet in spite of these laudable qualities, it reiterated that "in relationship to the depraved conduct that has occurred, it seems to me that the guidelines level [is] insufficient." *Id.* at 18.

apparent intent to enter her in a specific fight; (2) the fact that Mr. Ware had received a dog named "Bull" from Mr. Arellano; (3) various recorded phone calls between Mr. Ware and Mr. Gaines, in which they appeared to discuss fighting Bubbles, as well as other matters related to fighting, transporting, and selling dogs; and (4) Mr. Ware's possession of nearly 100 photos of dogs, with notes on the back pertaining to the dogfighting venture.

The District Court further stated its belief that the variance was necessary "to reflect the seriousness of the offense," "to afford adequate deterrence to criminal conduct," and "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(2)(A)–(B), (a)(6). In the interest of uniformity, the District Court recited the sentences it had imposed on other defendants involved in the conspiracy. Against this backdrop, it reiterated that a twenty-four-month sentence "seems to be reasonable when considering all the factors." Ware App. 20.

The District Court also expressed a policy disagreement with the Guidelines, which undergirded its decision to vary upward:

> I believe this activity of dogfighting ventures is depraved. It's inhumane, it's cruel; there's hardly words to describe it, it's so horrible in my mind. So, it doesn't seem to me that the guideline provisions on a guideline level 10, is an appropriate measure of the crime in this instance.

*Id.* at 16–17; *see also id.* at 20 (stating that the conduct at issue "needs to have a serious penalty with it, and that's why I'm varying upwards."). A district court is permitted to "vary from the . . . Guidelines based on [a] policy disagreement with them." *Spears v.*

8

*United States*, 555 U.S. 261, 264 (2009) (per curiam) (emphasis omitted); *see also Tomko*, 562 F.3d at 570; *United States v. Arrelucea-Zamudio*, 581 F.3d 142, 150 (3d Cir. 2009).

Notably, "closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range 'fails properly to reflect § 3553(a) considerations' even in a mine-run case." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)). Here, it appears likely that the District Court believed that the Guidelines were too lenient even in a typical case under the statute, given that Mr. Ware (who had a minimal criminal history) had not been convicted on any substantive count. Still, our close review reveals no basis for reversal. The District Court provided "a reasoned, coherent, and sufficiently compelling explanation of the basis for [its] disagreement," which was thoroughly "grounded in the § 3553(a) factors." *United States v. Grober*, 624 F.3d 592, 600 (3d Cir. 2010) (quoting *United States v. Merced*, 603 F.3d 203, 220 (3d Cir. 2010)) (alteration in original). Accounting for all the sentencing factors, it explained that "its policy judgment would serve the § 3553(a) sentencing goals" (including because a "serious penalty" is necessary for "deterrence," Ware App. 20).[5] *Grober*, 624 F.3d at 600 (quoting *Merced*, 603 F.3d at 221).

---

[5]     The reasonableness of the District Court's determination is further demonstrated by the fact that in 2016, the United States Sentencing Commission amended the Guidelines to raise the base offense level for animal fighting from ten to sixteen. Pursuant to this amendment, Mr. Ware's guideline sentence would have been twenty-four to thirty months. U.S.S.G. § 2E3.1. Thus, the District Court's variance comports with the Sentencing Commission's assessment of the penalties commensurate with offenses

In summary, the District Court found that Mr. Ware had engaged in "substantial activity in furtherance of the animal fighting venture," including "very substantive conduct that deserves 24 months of imprisonment." Ware App. 20. It also deliberately calibrated the sentence to be consonant with the sentences imposed on defendants in related cases. The District Court concluded, "this conduct is just extraordinarily outrageous and criminal and needs to be punished based on [Mr. Ware's] activities." *Id.* at 21. On this record, which we review for abuse of discretion, we conclude that the variance was based on legitimate, appropriate, and sufficiently individual considerations. The District Court did not abuse its discretion in varying upward.

## II. Appellant Elliott

### A. Background

In June 2016, federal agents searched Mr. Elliott's residence, where co-conspirator Frank Nichols also resided. There, they discovered thirteen pit bull-type dogs, housed in a manner consistent with dogfighting; medical supplies, equipment, and medication; documents including registration for dogs and pedigree information; and items such as "break sticks" and dog restraining devices. A pedigree book found in the search contained an entry for "Elliott's Shottsie," owned by Robert Elliott, and "Arrelano's

---

involving an animal fighting venture. *See* Sentencing Guidelines for United States Courts, 81 Fed. Reg. 27,265 (May 5, 2016) ("The Commission also determined that the increased base offense level better accounts for the cruelty and violence that is characteristic of these crimes, as reflected in the extensive public comment and testimony . . . .").

Sugar."[6]  A registry specific to fighting dogs listed Mr. Elliott as the breeder and owner for "Elliott's 2 Face," which was the offspring of "Elliott's Cindy" and "Elliott's Black." Other pedigree records showed that Mr. Elliott had owned and bred numerous dogs.  It was stipulated, however, that Mr. Elliott did not own Fancy, one of the dogs found at his home.  Rather, the evidence indicated that Mr. Gaines owned Fancy, and she was temporarily in the care of Mr. Nichols and Mr. Elliott while they whelped a litter of Fancy's puppies.

The evidence at trial further showed that Mr. Elliott was mentioned in a call between Mr. Nichols and Mr. Gaines.  Mr. Nichols told Mr. Gaines that he and Elliott "were trying to find some rolls for these bitches," referring to a particular type of dogfight.  Elliott App. 2656.  Mr. Nichols then said, referring to Mr. Elliott, "he was telling me to call you and ask you, . . . could you hook something up for us?" *Id.*  On a call with Lydell Harris, another co-conspirator, Mr. Gaines mentioned Mr. Elliott, saying, "Bob, he so good with them dogs, man, Fancy been off of her puppies after the first week and a half, man."  Elliott App. 2658.

Mr. Elliott was convicted of (i) one count of conspiracy to sell, buy, possess, train, transport, deliver, and receive dogs for purposes of having the dogs participate in animal fighting ventures, contrary to 7 U.S.C. § 2156(b) and 18 U.S.C. § 49 and in violation of 18 U.S.C. § 371; and (ii) twelve counts of knowingly possessing a dog for purposes of having the dog participate in an animal fighting venture in violation of 7 U.S.C.

---

[6]    Despite the misspelling, it appears that this may be a reference to co-conspirator Robert Arellano.  *See* n.1.

11

§ 2156(b), 18 U.S.C. § 49, and 18 U.S.C. § 2.  He was acquitted of conspiracy to sponsor and exhibit dogs in an animal fighting venture.

At sentencing, the District Court found that the twelve convictions for possession of dogs should not be "grouped" under the United States Sentencing Guidelines.  As a result, the District Court imposed a sentence of 24 months.  Had the counts been grouped, the maximum sentence under the Guidelines would have been twelve months of imprisonment.  *See* U.S. SENT'G GUIDELINES MANUAL § 5A (U.S. SENT'G COMM'N 2015).

On appeal, Mr. Elliott claims for the first time that (1) the evidence at trial in fact proved multiple conspiracies, thus varying from the indictment, and that he was prejudiced as a result, and (2) that the District Court's grouping analysis was erroneous.

B.    Claimed Variance from Indictment

We "review the sufficiency of the evidence in the light most favorable to the Government, and credit all reasonable inferences that support the verdict[]." *United States v. Perez*, 280 F.3d 318, 342 (3d Cir. 2002).  Because this claimed error was not brought to the District Court's attention, we will reverse only if it constitutes plain error affecting Mr. Elliott's substantial rights. *United States v. Olano*, 507 U.S. 725, 734–35 (1993).

Mr. Elliott asserts that at trial, the Government proved at least two conspiracies: one involving Messrs. Gaines, Nichols, Arellano, Ware, and Love, and the other involving only Messrs. Gaines, Nichols, and Elliott. *See Kotteakos v. United States*, 328 U.S. 750 (1946).  He emphasizes that of the alleged co-conspirators, he had direct contact

12

with only one—Frank Nichols, who in turn interacted with Mr. Gaines on Mr. Elliott's behalf. Mr. Elliott asserts that there was no evidence at trial showing that he had contact with or knowledge of Mr. Arellano, Mr. Love, and Mr. Ware, or more generally that he had reason to know the nature or extent of Mr. Gaines's dogfighting activity. In contrast, he submits, Mr. Arellano, Mr. Love, and Mr. Ware all had direct contact with one another and "played related roles in specific dog fighting and dog training activities with Mr. Gaines and to a lesser extent with Mr. Nichols." Elliott Br. 24–25.

"A conviction must be vacated when (1) there is a variance between the indictment and the proof presented at trial and (2) the variance prejudices a substantial right of the defendant." *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989). Where an indictment alleges a single conspiracy but the evidence at trial "proves only the existence of multiple conspiracies," there is a variance. *Id.*

When an appellant claims a variance, "we evaluate whether the record, when viewed in the light most favorable to the government, contains substantial evidence" that defendant was part of a single conspiracy that also included his co-conspirators. *United States v. Kemp*, 500 F.3d 257, 287 (3d Cir. 2007). "[T]o determine whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies," we: (1) "examine whether there was a common goal among the conspirators," (2) "look at the nature of the scheme to determine whether 'the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators,'" and (3) "examine the extent to which the participants overlap in the

13

various dealings." *Kelly*, 892 F.2d at 259 (quoting *United States v. DeVarona*, 872 F.2d 114, 119 (5th Cir. 1989)).

Here, viewing the evidence in the light most favorable to the Government, the record contains substantial evidence that Mr. Elliott and his alleged co-conspirators, including his co-defendants, joined a single conspiracy to sell, buy, possess, train, transport, deliver, and receive dogs for the purpose of having the dogs participate in an animal fighting venture.

First, the evidence supports a finding that the co-conspirators shared a common goal, to wit:  advancing dogfighting activities, specifically by possessing, receiving, selling, conveying, or training dogs for fighting.  Mr. Elliott does not appear to contest this.

Second, the agreement contemplated bringing to pass a continuous result that required the cooperation of all the conspirators, including Mr. Elliott.  The trial evidence showed that at one point Mr. Elliott possessed twelve dogs, not including Fancy, that were being raised to fight, and that he weaned Fancy's puppies for Mr. Gaines.  At trial, an expert witness testified that individuals involved in dogfighting "typically want to have more animals than not, so that they can refresh their yard or they can breed, and so that they have a selection or variety."  Elliott App. 1633.  The same witness testified to the importance of pedigree for those seeking to acquire new fighting dogs.

Weaning the offspring of Fancy, an experienced fighting dog, enabled the purchases, further breeding, and actual fighting that were essential to this common venture.  Maintaining other dogs—whether to present as opponents in fights or to sell or

14

use for breeding—is similarly integral to the continuous result contemplated: moving, training, and keeping dogs for animal fighting ventures. In other words, Elliott's activities were "necessary or advantageous to . . . . the overall success of the venture" in which all his co-defendants were engaged. *Kelly*, 892 F.3d at 259 (quoting *DeVarona*, 872 F.2d at 118). The evidence showed that Mr. Elliott also relied on other parties to the conspiracy, as when he (through Mr. Nichols) asked Mr. Gaines to help them find dogfights for the dogs in their possession.

Finally, this is not a classic "rimless wheel" conspiracy where the co-conspirators are connected to one another only via the central actor—the "hub." *See Kotteakos*, 328 U.S. at 754–55. Rather, the activities of the co-conspirators overlapped significantly. For instance, Mr. Nichols and Mr. Gaines transported a dog to Mr. Ware, and Mr. Arellano sold and conveyed dogs to Mr. Gaines, Mr. Love, and Mr. Ware.

For the foregoing reasons, we will affirm Mr. Elliott's conspiracy conviction.

C.      Application of Grouping Rules

Because Mr. Elliott did not object to the application of the grouping rules at trial, we review the sentence for plain error. *Olano*, 507 U.S. at 734–35.

When sentencing Mr. Elliott, the District Court noted that the Third Circuit has yet to decide whether dogs qualify as "victims" for sentencing purposes, such that crimes involving different dogs are not grouped under § 3D1.2 of the Guidelines. In light of this, it provided an alternative basis for its sentence:

> [I]f the event occurs that the presentence report as I have adopted [it] is not accepted by the Third Circuit because they think that the possession of the dogs should be grouped, my rationale on the 24 months would stay the same.

15

> With Mr. Elliott, he was a 10, which was—I think the max was 14 months; and I added 10 months to get to the 24.
>
> I would do the same if I had Mr. Elliott and his guidelines was a 10 rather than a 15, I would impose a sentence of 14 months and I would add 10 as an upward variance, because the guidelines do not reflect the seriousness of the offense. So under either circumstance[] I would maintain that the sentence that I imposed here is appropriate.

Elliott App. 2547.

In fact, if Mr. Elliott's base offense level were a ten, the Guidelines range would have been six to *twelve* months given his criminal history category of I. U.S. SENT'G GUIDELINES MANUAL § 5A (U.S. SENT'G COMM'N 2015). Still, the District Court's statement that it would vary upward "to get to" the twenty-four-month sentence indicates that it viewed this as the appropriate sentence after application of the § 3553(a) factors.

Indeed, the District Court explained its decision *not* to vary from that sentence because, inter alia, it believed the twenty-four-month sentence avoided "unwarranted sentencing disparities between Mr. Elliott and other folks that were involved in this conspiracy." Elliott App. 2544. It stated that Mr. Elliott's conduct was, in its view, "similar to [that of] Mr. Ware," Elliott App. 2545, who also received a twenty-four-month sentence.

Because the District Court expressly stated that it would have imposed the same sentence even if the counts were grouped, Mr. Elliott was not prejudiced by the grouping analysis. Thus, we will not disturb the sentence on plain error review. *See Olano*, 507 U.S. at 734–35.

16

## III. Appellant Love

### A. Background

Mr. Love was convicted of (i) conspiracy to sponsor and exhibit dogs in animal fighting ventures, contrary to 7 U.S.C. § 2156(a)(1) and 18 U.S.C. § 49 and in violation of 18 U.S.C. § 371; (ii) conspiracy to sell, buy, possess, train, transport, deliver, and receive dogs for purposes of having the dogs participate in animal fighting ventures, contrary to 7 U.S.C. § 2156(b) and 18 U.S.C. § 49 and in violation of 18 U.S.C. § 371; (iii) two counts of knowingly purchasing and receiving a dog for purposes of having the dog participate in an animal fighting venture, contrary to 7 U.S.C. § 2156(b), 18 U.S.C. § 49, and 18 U.S.C. § 2; and (iv) six counts of knowingly possessing a dog for purposes of having the dog participate in an animal fighting venture, contrary to 7 U.S.C. § 2156(b), 18 U.S.C. § 49, and 18 U.S.C. § 2.

At trial, Mr. Love attempted to establish that his participation in the conspiracy was in his capacity as an informant in a dogfighting investigation. Specifically, Mr. Love sought to develop the theory that he had cooperated with Larry Donato, then a New Jersey SPCA officer, when he "engaged in activities designed to cultivate information about dog fighting ventures and persons involved in illegal dog fighting activities." Love App. 116a. The Government argued that Mr. Love was asserting a public authority defense and that he had failed to comply with the notice requirements set forth in Federal Rule of Criminal Procedure 12.3.

This rule prescribes the procedures to be followed "[i]f a defendant intends to assert a defense of actual or believed exercise of public authority on behalf of a law

17

enforcement agency or federal intelligence agency at the time of the alleged defense." Fed. R. Crim. P. 12.3(a)(1). The rule requires the defendant to inform the prosecution of her intent to assert the defense "within the time provided for filing a pretrial motion." *Id.* It also permits the government to make a written request, before trial, for the defendant to disclose the identity of witnesses upon whom the defendant intends to rely to establish the defense. Fed. R. Crim. P. 12.3(a)(4).

On the fourth day of trial, the Government petitioned the District Court to preclude the testimony of any witnesses who would have testified in support of a public authority defense, including "Government witnesses who have been subject to cross-examination under this theory." Love App. 31a. When the issue was first raised, Mr. Love's counsel, Mr. Powell, argued that Rule 12.3 was inapplicable. In a written submission and subsequent oral presentations, Mr. Powell explained that Mr. Love sought to assert an "innocent intent" defense, as opposed to a public authority defense.[7]

The District Court initially denied the Government's motion, which the Government subsequently renewed multiple times. The first renewal was based on new discovery the Government had obtained from Mr. Powell, including text messages in which Mr. Love appeared to tell Mr. Donato that he was working for a federal government employee. The District Court deemed the issue unripe and declined to rule on the renewed motion. The Government next raised the issue at a sidebar while Mr.

---

[7]   In this letter motion, Mr. Powell further maintained that the lack of prior notice had not caused prejudice to the Government and that Mr. Love should be permitted to develop the public authority defense. However, Mr. Powell maintained consistently that Mr. Love was not asserting a public authority defense and would not do so.

Love was on the stand, after Mr. Powell had asked him various permutations of the question: "Everything that we've seen in the case that relates to you, to your understanding were those all activities undertaken by you at the behest of Mr. Donato?" Elliott App. 2234–35. Prior to this sidebar, Mr. Love had also testified about unproduced emails with Donato and had discussed his interactions with "an alleged public official named John for whom [the defense] ha[d] a recording that [the Government] never received."[8] Love App. 92a. The District Court did not rule on the motion at this time.

After Mr. Love's testimony had concluded, the District Court found he had certainly "asserted an actual exercise of public authority." Love App. 103a. The District Court granted the Government's renewed motion.

The immediate result of this ruling was the preclusion of certain testimony of Special Agent Nicholas Tranchitella. Mr. Powell had proffered that Agent Tranchitella's testimony would be relevant "as to whether or not he had an opportunity to interview Mr. Donato and as to whether or not Mr. Donato is actually a real person and a real former employee of the SPCA." Love App. 101a. The District Court also charged the jury regarding the public authority defense, over Mr. Powell's objection, and did not instruct the jury regarding an innocent intent defense. In its jury charge, the District Court stated that Mr. Love should not be found guilty if the jury were to find that (1) a government official directed Mr. Love to engage in the conduct charged against him, (2) the official

---

[8]     More broadly, Mr. Love had also testified throughout his direct examination about the informant relationship he had purportedly developed with Mr. Donato and other police officers, as well as the actions he took to further these relationships.

had actual or apparent authority to grant such authorization, and (3) in engaging in the conduct, Mr. Love reasonably relied on the official's actual or apparent authorization.

Mr. Love claims that the District Court erred in treating his theory as a public authority defense and therefore erred in excluding a defense witness and charging the jury on a public authority defense but not an innocent intent defense. In the alternative, he argues that he *did* have a viable public authority defense, and his counsel was ineffective in failing to pursue that defense (including by failing to follow the prescribed procedures).

## B. Rulings Pursuant to Rule 12.3

We review the district court's exclusion of evidence for abuse of discretion, and we apply the same standard to jury instructions. *United States v. Duka*, 671 F.3d 329, 348 (3d Cir. 2011); *United States v. Jimenez*, 513 F.3d 62, 74 (3d Cir. 2008); *Glass v. Phila. Elec. Co.*, 34 F.3d 188, 191 (3d Cir. 1994). "Evidentiary errors objected to at trial are reviewed for harmless error"; error is harmless if "it is highly probable that the error did not affect the result." *United States v. DeMuro*, 677 F.3d 550, 557 (3d Cir. 2012) (quoting *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011)). An erroneous jury instruction issued over the defendant's contemporaneous objection will be upheld only if "harmless beyond a reasonable doubt." *Cordaro v. United States*, 933 F.3d 232, 245 (3d Cir. 2019) (quoting *United States v. Fattah*, 914 F.3d 112, 155 (3d Cir. 2019)).

### 1. *Exclusion of Evidence*

It is highly probable that the exclusion of Agent Tranchitella's testimony did not affect the result in this case, so any error was harmless. The innocent intent defense

20

implicates the defendant's mental state; it asserts that the requisite mens rea was lacking. *See United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994). Mr. Powell explicitly disclaimed any intention to elicit testimony about the "nature of the conversation between Special Agent Tranchitella and Larry Donato," but he maintained that Agent Tranchitella's testimony would have been relevant to establish Mr. Donato's actual existence and erstwhile employment by the SPCA. Love App. 101a. These facts—that Mr. Donato is not fiction or figment, and that he was indeed an SPCA employee[9]—are not particularly probative of Mr. Love's mental state. *See United States v. Anderson*, 872 F.2d 1508, 1517–19 (11th Cir. 1989) ("Appellants' claim of innocent intent was adequately raised without the [excluded] material," which "added little, if anything, to the plausibility of their claim"; further, excluded material was likely to confuse or mislead the jury and therefore was properly excluded under Federal Rule of Evidence 403).

Indeed, the substantial relevance of the testimony would have been to support a public authority defense. Of course, Mr. Love maintains that he did not seek to mount such a defense. More to the point, if he did intend to do so, the exclusion of the testimony would have been proper pursuant to Rule 12.3 because Mr. Love did not provide the requisite notice under the rule.

---

[9]    The Government did not attempt to contest these facts. For instance, it made no objection to Mr. Powell's discussing, during redirect examination of Mr. Love, the U.S. Attorney's Office having interviewed Mr. Donato.

### 2. *Jury Instructions*

Mr. Love was not prejudiced by the District Court's delivery of a jury instruction on the public authority defense. Though he argues that the instruction imposed on him "a burden of proof on a defense that was not his," Love Br. 49, he was required to shoulder this burden *only if* he intended to make out a public authority defense. *See United States v. Sanders*, 962 F.2d 660, 675–76 (7th Cir. 1992) (court did not err in delivering instruction on coercion defense where defendants did not assert this defense and facts did not support coercion as a matter of law, but nonetheless the evidence "may have raised a question about coercion in the jury's mind," and the instruction "address[ed] possible doubt on this issue"); *see also Martin v. Ohio*, 480 U.S. 228, 233–34 (1987) (due process clause not violated where defendant was required to prove self-defense, even though elements of crime and of self-defense overlap). If he did not seek to raise the defense to begin with, the instruction did not alter his onus. Indeed, the District Court properly instructed the jury that "each defendant is presumed innocent and he is not required to present any evidence or produce any witnesses." Elliott App. 2449.

We do not here insinuate that a superfluous jury instruction on an affirmative defense will *always* be harmless beyond a reasonable doubt. It may well be that, on the facts of a particular case, the administration of a superfluous instruction could confuse the jury or unfairly color the jury's perception of the evidence. Here, however, Mr. Love has

22

not identified any source of prejudice other than burden-allocation, and we find none.[10]

In this case, therefore, the instruction given was harmless beyond a reasonable doubt.

Nor did the District Court abuse its discretion in declining to charge the jury on an innocent intent defense. Innocent intent is not an affirmative defense, but rather an assertion that the prosecution has not borne its burden in proving the requisite mens rea. Thus, specific jury instructions were not required.

In *United States v. Gross*, this Court, aligning itself with the majority of circuits to have addressed the issue, held that "the good faith defense instruction is merely surplusage"; it is "simply a reiteration that the government must carry its burden in demonstrating that the accused acted knowingly and willfully." 961 F.2d 1097, 1103 (3d Cir. 1992).[11] In *Gross*, we determined that "[b]y giving a detailed instruction on the elements of the crime with which Gross was charged, the court ensured that a jury finding of good faith would lead to an acquittal." 961 F.2d at 1103. So too here: no additional instruction was necessary to facilitate a finding that Mr. Love had an "innocent intent" and therefore lacked the requisite mens rea.

---

[10]  If anything, the instruction delivered (which did not refer to a *federal* government official and which encompassed apparent as well as actual authority) may have been more favorable to Mr. Love than the instruction requested (which would have required the imprimatur of a federal official, as discussed below). *Compare* Elliott App. 2479–80 *with* Love App. 108a and Fed. Crim. Jury Instr. 7th Cir. 6.07 (2020 ed.)

[11]  Like the innocent intent defense, the good faith defense is essentially an assertion that the defendant lacked the specific intent that is an element of the charged crime; they are different terms for the same theory. *Compare United States v. Xiong*, 914 F.3d 1154, 1159–60 (8th Cir. 2019), *with Gross*, 961 F.2d at 1100.

23

Further, the particular instruction Mr. Powell sought was inapposite. Counsel specifically sought an instruction based on the Seventh Circuit's model jury charge for "Entrapment by Estoppel." The Seventh Circuit has held that the "Entrapment by Estoppel" defense is very narrow and "does not apply when a defendant charged with a federal crime claims to have been misled by a state official." *United States v. Baker*, 438 F.3d 749, 755 (7th Cir. 2006). Indeed, the model jury instruction lists the first element of this defense thus: "An official *of the United States government*, with actual or apparent authority over the matter, told the defendant that his conduct would be lawful." Fed. Crim. Jury Instr. 7th Cir. 6.07 (2020 ed.) (emphasis added). The District Court did not err in declining to deliver this instruction.

C.     Ineffective Assistance of Counsel

This Court has expressed a "strong preference for reviewing allegations of ineffective assistance of counsel in collateral proceedings under 28 U.S.C. § 2255 rather than on direct appeal." *United States v. Sandini*, 888 F.2d 300, 312 (3d Cir. 1989) (collecting cases). We have recognized a narrow exception to this general rule where the trial record is sufficiently developed to permit resolution of the issues on appeal. *See United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991).

Here, as the District Court noted, a hearing would be necessary to fully develop the record regarding Mr. Powell's performance and strategy. Accordingly, the challenge is more properly taken up in a collateral proceeding, and we will not reach the issue on this direct appeal.

24

## CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgments of conviction.